## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FINCH PRUYN AND COMPANY, INC., Individually and on Behalf of all Others Similarly Situated, **Plaintiff,** v. ATOFINA CHEMICALS, INC.; ARKEMA INC.; TOTALFINAELF S.A.; TOTAL S.A.; FMC CORPORATION; SOLVAY INTEROX, INC.; SOLVAY AMERICA, INC.; SOLVAY CHEMICALS, INC.; SOLVAY S.A.; DEGUSSA CORPORATION; DEGUSSA A.G.; EKA CHEMICALS, INC.; AKZO NOBEL, INC.; AKZO NOBEL CHEMICALS INTERNATIONAL B.V.; KEMIRA CHEMICALS, INC.; and KEMIRA OYJ, **Defendants.** | Civil Action No. _____ **CLASS ACTION COMPLAINT** **JURY TRIAL DEMANDED** |

Plaintiff, individually and on behalf of a Class of all those similarly situated, brings this action for damages and injunctive relief under the antitrust laws of the United States against defendants, demanding a trial by jury, and complaining and alleging as follows:

### NATURE OF THE CASE

1.     This lawsuit is brought as a class action on behalf of all individuals and entities who purchased hydrogen peroxide, and its downstream products sodium perborate and sodium percarbonate, in the United States directly from defendants, their predecessors or their controlled subsidiaries and affiliates from at least as early as January 1, 1994 to the present (the "Class Period").  Plaintiff alleges that during the Class Period the defendants conspired to fix, raise, maintain or stabilize prices of, and to control and restrict output for, hydrogen peroxide, and its

downstream products sodium perborate and sodium percarbonate, sold in the United States and worldwide. Because of defendants' unlawful conduct, Plaintiff and other Class members paid artificially inflated prices for hydrogen peroxide and, as a result, have suffered antitrust injury to their business or property.

## JURISDICTION AND VENUE

2.     This action is instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against defendants for the injuries sustained by Plaintiff and the members of the Class by reason of the violations, as hereinafter alleged, of Section 1 of the Sherman Act, 15 U.S.C. § 1.

3.     This action is also instituted to secure injunctive relief against defendants to prevent them from further violations of Section 1 of the Sherman Act, as hereinafter alleged.

4.     Jurisdiction is conferred upon this Court by 28 U.S. C. §§ 1331 and 1337 and by Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

5.     Venue is found in this district pursuant to Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26 and 28 U.S.C. § 1391(b), (c) and (d). Venue is proper in this judicial district because during the Class Period one or more of the defendants resided, transacted business, was found, or had agents in this district, and because a substantial part of the events giving rise to plaintiff's claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out, in this district.

6.     Defendants, on information and belief, maintain offices, have agents, transact business, or are found within this judicial district.

7.     This Court has *in personam* jurisdiction over each of the defendants because each was engaged in an illegal scheme and price-fixing and output-controlling conspiracy that was directed at and had the intended effect of causing injury to persons and entities residing in, located in, or doing business throughout the United States.

## DEFINITIONS

8.     As used herein, the term:

a.     "Hydrogen peroxide" includes hydrogen peroxide and its downstream products sodium perborate and sodium percarbonate and means an inorganic chemical compound that is a strong oxidizing agent, which is widely used in the pulp and paper industry for bleaching of pulps, and also used for bleaching textiles in the textile industry, in chemical and laundry products and other bleaching-related markets, and for drinking water and industrial wastewater treatment;

b.     "Person" means any individual, partnership, corporation, association or other business or legal entity; and

c.     "Class Period" refers to the period from at least January 1, 1994 to the present.

## PLAINTIFF

9.     Plaintiff, Finch Pruyn and Company, Inc. ("Plaintiff"), was at all relevant times a New York corporation with its principal place of business located in Glens Falls, New York. During the relevant time period, Plaintiff purchased hydrogen peroxide in the United States directly from one or more of the defendants. The prices paid for hydrogen peroxide that Plaintiff paid to defendants or their co-conspirators rose as a result of the conspiracy herein alleged, and as

a result of the alleged conspiracy, Plaintiff was injured in its business and property by reason of the antitrust violations alleged herein.

## DEFENDANTS

10.    Defendant Atofina Chemicals, Inc. ("Atofina") is a Pennsylvania corporation with its principal place of business at 2000 Market Street, Philadelphia, Pennsylvania 19103. Atofina manufactured, marketed and/or sold hydrogen peroxide in this district and the United Stated during the Class Period, both directly and through its predecessors, successors, affiliates and/or subsidiaries. Atofina was formed in 2000 following the merger of TotalFina S.A. and Elf Aquitaine S.A. The company was formerly known as Elf Atochem North America, Inc., the U.S. chemicals unit of Elf Aquitaine S.A. Atofina was the U.S. chemicals unit of TotalFinaElf S.A., and a wholly owned subsidiary of TotalFinaElf Holdings USA, Inc., which was in turn a wholly owned subsidiary of Defendant TotalFinaElf S.A. An Atofina subsidiary owned and operated the former operations of Chemprox Chemical, Inc., which had been a joint venture of Air Liquide S.A. and Elf Atochem S.A. producing hydrogen peroxide at its plant in Becancour, Quebec, Canada. In 1998 Elf Atochem North America, Inc. bought out the joint venture partner and became sole owner of the Quebec plant. Chemprox had a North American capacity of 160 million pounds in 1998. Elf Atochem North America, Inc. also purchased DuPont's hydrogen peroxide plant in Memphis, TN in 1998, which produces 70,000 tons per year. The two plants combined (Becancour, Quebec, Canada and Memphis, TN) made Elf Atochem (and later Atofina or Arkema Inc.), the world's third largest hydrogen peroxide producer in 1998.

11.    Defendant Arkema Inc. ("Arkema") is the successor corporation to Atofina Chemicals Inc., which was formed on October 1, 2004 as a part of the reorganization of the

4

chemical business of Total S.A. Arkema is a Pennsylvania corporation with its principal place of business at 2000 Market Street, Philadelphia, Pennsylvania 19103. At times relevant to this Complaint, Arkema directly and/or through the control of its subsidiaries and affiliates manufactured, marketed, sold and/or distributed hydrogen peroxide in this district and the United States.

12.     Defendant TotalFinaElf S.A. is a French corporation with its principal place of business in Paris, France. TotalFinaElf S.A. manufactured, marketed and/or sold hydrogen peroxide in this district and the United Stated during the Class Period through control of its predecessors, successors, affiliates and/or subsidiaries, including its wholly owned subsidiary defendant Atofina Chemicals, Inc. Since 1998, Atofina, and subsequently Arkema, has been the third largest producer of hydrogen peroxide in the world, with a production capacity of 341,000 metric tons and operating plants in Europe, North America and Asia.

13.     Defendant Total S.A. ("Total") was formed on May 6, 2003 and is the new name for Defendant TotalFinaElf S.A. Total is a French corporation with its principal place of business in Paris, France. At times relevant to this Complaint, Total directly and/or through the control of its subsidiaries and affiliates manufactured, marketed, sold and/or distributed hydrogen peroxide in this district and the United States.

14.     Defendants Atofina Chemicals, Inc., Arkema Inc., TotalFinaElf S.A. and Total S.A. are collectively referred to herein as the "Atofina Defendants."

15.     Defendant FMC Corporation ("FMC") is a Delaware corporation with its principal places of business at 1735 Market Street, Philadelphia, PA 19103 and 200 East Randolph Drive, Chicago, Illinois 60601. At times relevant to this Complaint, FMC directly

and/or through the control of its subsidiaries and affiliates manufactured, marketed, sold and/or distributed hydrogen peroxide in this district and the United States. FMC had a capacity of 283 million pounds of hydrogen peroxide production in 1998. FMC has operated hydrogen peroxide plants in Prince Georges, British Columbia, Bayport, Texas and Spring Hill, West Virginia, as well as Europe and the Far East and is the largest domestic producer of hydrogen peroxide.

16.     Defendant Solvay Interox, Inc. ("Solvay Interox") is a Delaware corporation with its principal place of business at 3333 Richmond Avenue, Houston, TX 77098. Solvay Interox manufactured, marketed and/or sold hydrogen peroxide in the United Stated during the Class Period, both directly and through its predecessors, affiliates and/or subsidiaries. Solvay Interox is a wholly owned subsidiary of Solvay America, Inc., which in turn is a wholly owned subsidiary of defendant Solvay S.A., Brussels, Belgium. Solvay Interox was the third largest producer in the U.S. in 1998, with a North American capacity of 236 million pounds. Solvay Interox has annual sales of approximately $137 million from the sale of hydrogen peroxide (75%) and sodium perborate (25%). Solvay Interox operates a hydrogen peroxide plant in Deer Park, TX. In late 2004, Solvay Interox, Inc. was combined and reorganized, along with Solvay Minerals and Solvay Fluorides, to become Defendant Solvay Chemicals, Inc.

17.     Defendant Solvay America, Inc. ("Solvay America") is a Delaware corporation with its principal place of business at 3333 Richmond Avenue, Houston, TX 77098. Solvay America manufactured, marketed and/or sold hydrogen peroxide in the United Stated during the Class Period, both directly and through its predecessors, affiliates and/or subsidiaries including its wholly owned subsidiary Defendant Solvay Interox. Solvay America is a wholly owned subsidiary of defendant Solvay S.A., Brussels, Belgium.

6

18.     Defendant Solvay Chemicals, Inc. ("Solvay Chemicals") was formed in late 2004 from the combination of Solvay Interox, Solvay Minerals and Solvay Flourides and maintains its principal place of business at 3333 Richmond Avenue, Houston, TX 77098. Solvay Chemicals is a Delaware corporation and a wholly owned subsidiary of Defendant Solvay, S.A. At times relevant to this Complaint, Solvay Chemicals directly and/or through the control of its subsidiaries and affiliates manufactured, marketed, sold and/or distributed hydrogen peroxide in this district and the United States.

19.     Defendant Solvay S.A. is a Belgium corporation with its principal place of business at Brussels, Belgium. Solvay S.A. manufactured, marketed and/or sold hydrogen peroxide in this district and the United Stated during the Class Period through control of its predecessors, affiliates and/or subsidiaries, including its wholly owned subsidiaries Defendants Solvay America, Solvay Interox and Solvay Chemicals. The Solvay companies are currently the world's leading producers of hydrogen peroxide and its derivatives, with production units worldwide and $258 million in annual sales of hydrogen peroxide.

20.     Defendant Degussa Corporation ("Degussa") is an Alabama corporation with its principal place of business at 379 Interpace Parkway, Parsippany, New Jersey 07054. Degussa is a wholly owned subsidiary of defendant Degussa A.G., Duesseldorf, Germany. Degussa manufactured, marketed and/or sold hydrogen peroxide in the United Stated during the Class Period, both directly and through its predecessors, affiliates and/or subsidiaries. Degussa acquired the hydrogen peroxide business of DuPont in or about 1998 and became the largest producer of hydrogen peroxide in the U.S. Degussa had a North American capacity of 575 million pounds in 1998. Degussa operates a technical center for its "Bleaching & Water

7

Chemicals" business unit which produces hydrogen peroxide in Allendale, NJ, operates hydrogen peroxide plants in Mobile, AL and Winnemucca, NV, and has a research and applied technology site in Greensboro, NC.

21.     Defendant Degussa A.G. is a German corporation with its principal place of business in Dusseldorf, Germany.  Degussa A.G. manufactured, marketed and/or sold hydrogen peroxide in this district and the United Stated during the Class Period through control of its predecessors, affiliates and/or subsidiaries, including its wholly owned subsidiary Defendant Degussa Corporation.  The Bleaching & Water Chemicals business unit worldwide has an annual capacity of 430,000 metric tons with Degussa A.G. ranking second worldwide in hydrogen peroxide production.  About 60% of Dugussa A.G.'s production is used as an ecologically safe bleaching agent in the pulp and paper industry and textile industry.

22.     Defendants Degussa Corporation and Degussa A.G. are collectively referred to herein as the "Degussa Defendants."

23.     Defendant EKA Chemicals, Inc. ("EKA Chemicals") is a Delaware corporation with its principal place of business at 1775 West Oak Commons Court, Marietta, GA 30062. EKA Chemicals is the wholly owned subsidiary of Defendant Akzo Nobel, Inc., which in turn is a wholly owned subsidiary of Defendant Akzo Nobel Chemicals International, B.V.  At times relevant to this Complaint, EKA Chemicals directly and/or through the control of its subsidiaries and affiliates manufactured, marketed, sold and/or distributed hydrogen peroxide in this district and the United States.  EKA Chemicals had a North American capacity of 78 million pounds of hydrogen peroxide production in 1998 and, together with its affiliates, claims to be one of the world's largest manufacturers of hydrogen peroxide with a total global capacity of 245,000 tons

and production plants in Sweden, Norway, the United States and Venezuela. EKA Chemicals

has hydrogen peroxide plants in Columbus, MS and Moses Lake, WA.

24.     Defendant Akzo Nobel, Inc. is a Delaware corporation with its principal place of

business at 525 West Van Buren Street, Chicago, Illinois 60607. Akzo Nobel, Inc. is a wholly

owned subsidiary of Defendant Akzo Nobel Chemicals International B.V., and parent of

Defendant EKA Chemicals, Inc. At times relevant to this Complaint, Akzo Nobel, Inc. directly

and/or through the control of its subsidiaries and affiliates manufactured, marketed, sold and/or

distributed hydrogen peroxide in this district and the United States.

25.     Defendant Akzo Nobel Chemicals International B.V. is a Netherlands company

with its principal place of business at Velperweg 76, P.O. Box 9300, 6800 SB Arnhem, The

Netherlands. At times relevant to this Complaint, Akzo Nobel Chemicals International B.V.

directly and/or through the control of its subsidiaries and affiliates manufactured, marketed, sold

and/or distributed hydrogen peroxide in this district and the United States.

26.     Defendant Kemira Chemicals, Inc. ("Kemira Chemicals") is a Georgia

corporation with its principal place of business at 245 Townpark Drive, Suite 200, Kennesaw,

Georgia 30144. Kemira Chemicals is a wholly subsidiary of Defendant Kemira Oyj. Kemira

Chemicals operates facilities in Kennesaw, GA, Fortville, IN, Marietta, GA, Midway, GA and

Washougal, WA and operates a hydrogen peroxide plant in Canada. At times relevant to this

Complaint, Kemira Chemicals directly and/or through the control of its subsidiaries and affiliates

manufactured, marketed, sold and/or distributed hydrogen peroxide in this district and the United

States.

27.     Defendant Kemira Oyj ("Kemira") is a Finnish company with its principal place of business in Helsinki, Finland. Kemira is one of the major producers of hydrogen peroxide in the world, having production plants in Finland, The Netherlands, South Korea, Canada, Sweden and Japan. At times relevant to this Complaint, Kemira directly and/or through the control of its predecessors, subsidiaries and affiliates manufactured, marketed, sold and/or distributed hydrogen peroxide in this district and the United States.

28.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

## CO-CONSPIRATORS

29.     Various other persons, firms and corporations, not named as Defendants in this Complaint, have participated as co-conspirators with Defendants in the violations alleged herein, and aided, abetted and performed acts and made statements in furtherance of the conspiracy.

## CRIMINAL INVESTIGATIONS

30.     On January 31, 2005, the European Commission antitrust regulators confirmed that the European Commission had formally charged 18 chemical companies including Defendants Total S.A. (Arkema), Kemira Chemicals Oyj, Solvay S.A., Degussa A.G., Akzo Nobel N.V., as well as BASF A.G., with fixing prices of hydrogen peroxide and downstream products including sodium perborate and sodium percarbonate during the period from 1994 to 2001.

31.    European Commission spokesman Jonathan Todd said the Commission was particularly looking into agreements on prices, exchange of information on prices and sales volumes, agreements on the reduction of production capacity and the monitoring and implementation of the arrangements among the cartel members.  The formal charges followed the almost two-year investigation into the alleged cartel activities.

32.    According to news reports, Defendant Degussa A.G. "blew the whistle" on the cartel and may receive immunity or leniency from criminal fines and other penalties.

33.    The European Commission declined to identify the names of the additional twelve chemical companies against whom it filed criminal charges.

34.    On February 9, 2005, Defendant FMC Corporation confirmed in a Securities Exchange Commission form 8K filing that on January 28, 2005, it received a Statement of Objections from the European Commission concerning alleged violations of the competition law in the hydrogen peroxide business in Europe during the period 1994 to 2001.  FMC further confirmed that it received a subpoena for documents from a grand jury sitting in the Northern District of California, which is investigating anticompetitive conduct in the hydrogen peroxide business in the United States during the period from 1994 to 2003.

## CLASS ACTION ALLEGATIONS

35.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

36.    Plaintiff brings this action on behalf of itself and as a class action under the provisions of Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the following class:

> All persons (excluding governmental entities, defendants, co-conspirators, other producers of hydrogen peroxide, and the present and former parents, predecessors, subsidiaries and affiliates of the foregoing) who purchased hydrogen peroxide in the United States directly from any of the defendants or their co-conspirators, or any present or former parent, subsidiary or affiliate thereof, at any time during the period from January 1, 1994 until the present.

37.     Plaintiff believes that there are hundreds of Class members as above described, the exact number and their identities being known by defendants.

38.     The Class is so numerous and geographically dispersed that joinder of all members in impracticable.

39.     There are questions of law and fact common to the Class, which questions relate to the existence of the conspiracy alleged, and the type and common pattern of injury sustained as a result thereof, including but not limited to:

a.     Whether defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize prices and control and restrict output of hydrogen peroxide sold in the United States;

b.     The identity of the participants in the conspiracy;

c.     The duration of the conspiracy alleged in this Complaint and the nature and character of the acts performed by defendants and their co-conspirators in furtherance of the conspiracy;

d.     Whether the alleged conspiracy violated Section 1 of the Sherman Act;

e.     Whether the conduct of defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business and property of Plaintiff and other members of the class;

12

f.      The effect of defendants' conspiracy on the prices of hydrogen peroxide sold in the United States during the Class Period; and

g.      The appropriate measure of damages sustained by Plaintiff and other members of the class.

40.      Plaintiff is a member of the Class, Plaintiff's claims are typical of the claims of the Class members, and Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff is a direct purchaser of hydrogen peroxide and its interest are coincident with and not antagonistic to those of the other members of the Class. In addition, Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

41.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for defendants.

42.      Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

43.      The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

44.      A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Class is readily definable and is one for which records should exist in the files of defendants and their co-conspirators. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment as a class action will permit a

large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of relatively small claims by many class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint. This class action presents no difficulties of management that would preclude its maintenance as a class action.

## TRADE AND COMMERCE

45.     Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

46.     The activities of defendants and their co-conspirators, as described in this Complaint, were within the flow of, and substantially affected, interstate commerce.

47.     During the time period covered by this Complaint, defendants and their co-conspirators sold and distributed hydrogen peroxide throughout the United States.

48.     Defendants and their co-conspirators, and each of them, have used instrumentalities of interstate commerce to manufacture, sell, distribute and market hydrogen peroxide.

49.     Defendants and their co-conspirators have manufactured, sold and shipped substantial quantities of hydrogen peroxide in a continuous and uninterrupted flow of interstate commerce to customers located in states other than the states in which defendants produced hydrogen peroxide.

## THE HYDROGEN PEROXIDE INDUSTRY

14

50.     Hydrogen peroxide is an inorganic chemical compound ($H_2O_2$) and a colorless, syrupy liquid that is a strong oxidizing agent.  About 55% to 65% of hydrogen peroxide is purchased by the pulp and paper industry for bleaching pulp and paper.  Textiles and bleaching-related markets purchase about 20% of the hydrogen peroxide produced.  Drinking water and industrial wastewater treatment use about 15% of the hydrogen peroxide produced, and chemical synthesis, other indirect uses, account for the remaining 10% of sales of hydrogen peroxide.

51.     Hydrogen peroxide is sold in various standard and specialty grades and each grade is available in different concentrations.

52.     Hydrogen peroxide is widely used in the pulp and paper industry to brighten, delignify and control environmental upsets.  It has been widely considered to be the most viable chlorine alternative for bleaching applications.  For mechanical pulp, hydrogen peroxide is the only brightening solution that will provide high brightness gains while preserving yield.

53.     Hydrogen peroxide is commonly used for textile bleaching and desizing.  It is widely used on cotton, flax, linen, jute, wool, silk, synthetic blends and regenerated cellulose fibers.

54.     Hydrogen peroxide has environmental uses and is a proven, cost-effective solution for a variety of water, soil and toxic air emissions.  Hydrogen peroxide is used to control odors and corrosion within wastewater collection systems.  Refineries, chemical plants, paper mills, municipalities, soil remediators and many other types of operations use hydrogen peroxide to treat or control aldehydes, phenols and other aromatic compounds, reduce sulfur compounds, chlorine, cyanides and other pollutants.

55.     Hydrogen peroxide and its derivatives are used in chemical synthesis and are powerful oxidizing agents that are environmentally attractive, yet capable of oxidizing a wide

15

range of organic compounds.  Hydrogen peroxide is widely used in epoxidation and

hydroxylation reactions, oxidative cleavage reactions and for oxidizing ketones, aldehydes,

alcohols, organic nitrogen and organic sulfur compounds.

## VIOLATIONS ALLEGED

56.     It is clear that this conspiracy is international in nature and scope.  Defendants

themselves, on their websites, tout the global nature of their business and activities, and

specifically the global nature of the hydrogen peroxide market.  Defendants have viewed and

treated the hydrogen peroxide market as a global market.  In fact, the hydrogen peroxide market

is global in that the prices charged in the European Union affect the prices in the United States

and vice versa.  Defendants needed to, and did, collude in both regions in order to effectively

collude in either region.

57.     Beginning at least as early as January 1, 1994 and continuing until the present, the

exact dates being unknown to Plaintiff, defendants and their co-conspirators engaged in a

continuing agreement, understanding and conspiracy in restraint of trade to artificially raise, fix,

maintain or stabilize prices of, and to control and restrict output for, hydrogen peroxide in the

United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

58.     The contract, combination and conspiracy consisted of a continuing agreement,

understanding and concert of action among the defendants and their co-conspirators, the

substantial terms of which were to fix, raise and maintain, or stabilize prices for, and to control

and restrict output for, hydrogen peroxide in the United States.

16

59.    In formulating and effectuating the aforesaid contract, combination or conspiracy, defendants and their co-conspirators did those things that they combined and conspired to do, including, among other things:

    a.    agreeing to charge prices at certain levels and otherwise to fix, increase, maintain or stabilize prices of hydrogen peroxide sold in the United States;

    b.    exchanging information on prices and sales volumes;

    c.    agreeing on the reduction of production capacity;

    d.    monitoring and implementation of the arrangements among cartel members; and

    e.    selling hydrogen peroxide at the agreed upon prices.

60.    The activities described above have been engaged in by defendants and their co-conspirators for the purpose of effectuating the unlawful arrangements to fix, maintain, raise and/or stabilize prices of hydrogen peroxide.

61.    Defendants' supra-competitive prices were implemented by, *inter alia*, a series of coordinated price increase announcements that began in or about 1994. These coordinated price increases have continued on a regular basis through the present, with the actual and intended results that Plaintiffs and the Class members have paid supra-competitive prices for hydrogen peroxide for over a decade. Examples of these coordinated price increases are set forth *infra*.

62.    *Purchasing Magazine* reported that average prices of hydrogen peroxide rose steadily in 2001 and remained at $ .46 per pound until December 2001.

63.    In November 2002, all six producers selling in the United States announced price increases of 3 cents per pound on hydrogen peroxide to be implemented between November 2002 and January 2003. FMC announced the increase on November 6; Atofina and Kemira announced

on November 11; and Degussa and Solvay announced on November 18.  In a conference call with stock analysts on October 30, 2002, prior to the announcements of price increases in the press, FMC chairman and CEO William Walter stated: "We are in the process of implementing those price increases . . . .  It is premature to comment about the receptivity out there.  We have had support from the other competitors . . . ."

64.    In March and April 2003, the producers again announced either energy surcharges or price increases of 5 cents per pound on hydrogen peroxide to be implemented in April and May 2003.

## HISTORY OF ANTICOMPETITIVE ACTS

65.    Several defendants, including but not limited to Degussa AG, the Atofina Defendants and Akzo Nobel NV, are recidivists, displaying a pattern, plan, motive and *modus operandi* of engaging in illegal collusive conduct with respect to at least six different commodity products, several of which were marketed and sold in North America.

66.    For example, the conspiracy alleged in this case overlaps considerably with four other conspiracies in which Degussa has been alleged to have participated.  In three of these cases, Degussa has admitted or has been proven to have participated in the conspiracy.  In the past four years, antitrust authorities in the United States and Europe have investigated Degussa's participation in alleged agreements to fix the prices of organic peroxides, methionine, niacin and niacinamide, calcium carbide and discyandiamide:

a.    In May 2000, Degussa Hüls, A.G., the predecessor to Degussa A.G., agreed to plead guilty and pay $13 million in fines for participating in a global conspiracy to fix

the price of Vitamin B3 (niacin and niacinamide).  This conspiracy lasted from January 1990 to February 1999;

b.      In July 2002, the European Commission ("EC") fined Degussa 118 million Euros for its role in fixing the prices of methionine (an animal feed additive), finding that Degussa had shown "complete disregard" for its customers for 13 years in which the conspiracy operated from 1986 to 1999;

c.      In November 2002, German and Norwegian antitrust officials raided Degussa's office as part of an investigation into price-fixing of calcium carbide and discyandiamide;

d.      In December 2003, the European Commission fined Degussa UK Holdings Ltd. (jointly and severally with cartel members acquired by Degussa) 25.56 million Euros for participating in a 29-year conspiracy (January 1971 to the end of 1999) to raise prices and allocate markets for organic peroxide.  The EC fined the five cartel members, including the Atofina Defendants and Akzo Nobel NV, a total of 70 million Euros; and

e.      In September 2004, Degussa UK Holdings Ltd. pled guilty to criminal antitrust violations charged by the US Department of Justice and paid a $1.5 million fine for its participation in a conspiracy to suppress competition in the world market for organic peroxide from 1997 to 1998.

67.     Following investigation and charges brought by the US Department of Justice, in March 2002, Elf Atochem S.A., predecessor to the Atofina Defendants, pled guilty and was sentenced to pay a $3.5 million fine for its involvement in the conspiracy to suppress competition in the world market for certain organic peroxides from 1997 to 1998.

68.    Following investigation and charges brought by the U.S. Department of Justice, in April 2002, Elf Atochem S.A., predecessor to the Atofina Defendants, pled guilty and was sentenced to pay a $5 million fine for its involvement in the conspiracy to suppress competition in the world market for monochloroacetic acid from September 1995 to June 1997.

69.    Following investigation and charges brought by the U.S. Department of Justice, in June 2001, Akzo Nobel Chemicals NV pled guilty and was sentenced to pay a $12 million fine for its participation in a conspiracy to suppress competition in the world market for monochloroacetic acid from September 1995 to June 1997.

## FRAUDULENT CONCEALMENT

70.    Plaintiff had no knowledge of defendants' unlawful self-concealing conspiracy and could not have discovered the contract, combination or conspiracy at an earlier date by the exercise of due diligence because of the deceptive practices and techniques of secrecy employed by defendants to avoid detection of, and fraudulently conceal, their contract, combination or conspiracy.

71.    Because the contract, combination or conspiracy was kept secret by defendants, Plaintiff was unaware of the fact that prices of hydrogen peroxide were secretly agreed upon as alleged herein.

72.    As a result of the fraudulent concealment of the conspiracy, Plaintiff asserts the tolling of the applicable statute of limitations affecting the right of action by Plaintiff.

## EFFECTS

73.     The unlawful contract, combination or conspiracy has had the following affects, among others:

a.      prices charged by defendants and their co-conspirators to Plaintiff and the members of the Class for hydrogen peroxide were maintained at artificially high and non-competitive levels; and

b.      plaintiff and members of the Class had to pay more for hydrogen peroxide than they would have paid in a competitive marketplace, unfettered by defendants' and their co-conspirators' collusive and unlawful price-fixing.

74.     During and throughout the period of the aforesaid contract, combination or conspiracy, Plaintiff and members of the Class directly purchased hydrogen peroxide in the United States.

75.     Plaintiff and the other Class members paid more for the hydrogen peroxide that they purchased than they would have paid under conditions of free and open competition.

76.     As a direct and proximate result of the illegal combination, contract or conspiracy, Plaintiff and the members of the Class have been injured and financially damaged in their respective businesses and property, in amounts which are presently undetermined.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays as follows:

A.      That the Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure.

A.      That the contract, combination or conspiracy, and the acts done in furtherance thereof by defendants and their co-conspirators, be adjudged to have been in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

B.      That judgement be entered for Plaintiff and members of the Class against defendants for three times the amount of damages sustained by Plaintiff and the Class as allowed by law, together with the costs of this action, including reasonable attorneys' fees.

C.      That defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from, in any manner:

(1)      continuing, maintaining or renewing the contract, combination or conspiracy alleged herein, or from engaging in any other contract, combination or conspiracy having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect; and

(2)      communicating or causing to be communicated to any other person engaged in the manufacture, distribution or sale of any product except to the extent necessary in connection with a *bona fide* sales transactions between the parties to such communications.

D.      That Plaintiff and members of the Class have such other, further and different relief as the case may require and the Court may deem just and proper under the circumstances.

Dated: February 11, 2005                    Respectfully submitted,


Anthony J. Bolognese (AJB3935)
Joshua H. Grabar (JHG1707)
**BOLOGNESE & ASSOCIATES, LLC**
One Penn Center
1617 JFK Blvd., Suite 650
Philadelphia, PA 19103
Telephone: (215) 814-6750
Facsimile: (215) 814-6764
E-mail: abolognese@bolognese-law.com


Michael D. Hausfeld
**COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.**
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, DC 20005-3964
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
E-mail: mhausfeld@cmht.com


Linda P. Nussbaum
**COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.**
150 East 52nd Street, 30th Floor
New York, NY 10022-6017
Telephone: (212) 838-7797
Facsimile: (212) 838-7745
E-mail: lnussbaum@cmht.com


Arthur N. Bailey
**ARTHUR N. BAILEY & ASSOCIATES**
111 West Second Street, Suite 4500
Jamestown, NY 14701
Telephone: (716) 664-2967
Facsimile: (716) 664-2983
E-mail: artlaw@alltel.net


***Attorneys for Plaintiff***