**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: HYDROGEN PEROXIDE ANTITRUST LITIGATION | MDL No. 1682 |
| | Civil Action No. 05-666 |
| This Document Relates to: | **CONSOLIDATED, AMENDED CLASS-ACTION COMPLAINT** |
| INDIRECT-PURCHASER ACTION | |
| | **JURY TRIAL DEMANDED** |

Plaintiffs file this Consolidated, Amended Class-Action Complaint on behalf of themselves and all others similarly situated in the Class Jurisdictions (Arizona, California, Minnesota, Nebraska, New York, Tennessee, and Vermont) who purchased hydrogen peroxide, or its downstream products, sodium perborate or sodium percarbonate (collectively, "Hydrogen Peroxide"), indirectly from Defendants, their predecessors, or their controlled subsidiaries and affiliates during the Class Period, January 1, 1994 to the present. Plaintiffs allege their complaint upon information and belief, except as to those allegations that pertain to them, which are alleged on their personal knowledge.

### JURISDICTION AND VENUE

1.      This Court has subject-matter jurisdiction over this class action pursuant to the Class Action Fairness Act of 2005, which amended 28 U.S.C. §1332 to add a new subsection (d) conferring federal jurisdiction over class actions where, as here, "any member of a class of plaintiffs is a citizen of a state different from any defendant and the

aggregated amount in controversy exceeds $5,000,000.00, exclusive of interest and costs." This Court also has jurisdiction under 28 U.S.C. § 1332(d) because "one or more members of the class is a citizen of a state within the United States and one or more of the Defendants is a citizen or subject of a foreign state." This Court also has personal jurisdiction over Defendants because they systematically and continually conduct business in Pennsylvania, including marketing, advertising, and sales directed to residents here.

2.      Venue is proper in this District pursuant to 28 U.S.C. §1391 because Defendants reside, transact business, or are found within this District, and a substantial part of the events giving rise to Plaintiffs' claims arose here.

## PARTIES

### Plaintiffs

3.      Plaintiff Joelle Prochera is an Arizona resident who indirectly purchased Hydrogen Peroxide in Arizona from one or more of the Defendants during the Class Period.

4.      Plaintiff Colorfast Dye and Printhouse, Inc. is a California corporation that indirectly purchased Hydrogen Peroxide in California from one or more of the Defendants during the Class Period.

5.      Plaintiff Frank Gerenscer is a California resident who indirectly purchased Hydrogen Peroxide in California from one or more of the Defendants during the Class Period.

6.      Plaintiff Bernard Lawrence Winery is a California general partnership that indirectly purchased Hydrogen Peroxide in California from one or more of the Defendants during the Class Period.

7.  Plaintiff Joe Solo is a California resident who indirectly purchased Hydrogen Peroxide in California from one or more of the Defendants during the Class Period.

8.  Plaintiff Sharon Defren is a Minnesota resident who indirectly purchased Hydrogen Peroxide in Minnesota from one or more of the Defendants during the Class Period.

9.  Plaintiff Terry Muzzey is a Nebraska resident who indirectly purchased Hydrogen Peroxide in Nebraska from one or more of the Defendants during the Class Period.

10.  Plaintiff Laura Magnuson is a New York resident who indirectly purchased Hydrogen Peroxide in New York from one or more of the Defendants during the Class Period.

11.  Plaintiff Melinda Owens is a Tennessee resident who indirectly purchased Hydrogen Peroxide in Tennessee from one or more of the Defendants during the Class Period.

12.  Plaintiff Elizabeth Armstrong is a Vermont resident who indirectly purchased Hydrogen Peroxide in Vermont from one or more of the Defendants during the Class Period.

13.  The City of Stockton, California is a public entity that indirectly purchased Hydrogen Peroxide in California from one or more of the Defendants during the Class Period.

**The Atofina Defendants**

14.  Defendant Atofina Chemicals, Inc. is a Pennsylvania corporation with its principal place of business at 2000 Market Street, Philadelphia, Pennsylvania 19103.  In 2001, Atofina produced 150 millions of pounds of Hydrogen Peroxide in the U.S. Atofina was formed in 2000 after TotalFina S.A. and Elf Aquitaine S.A. merged.  Atofina was

formerly known as Elf Atochem North America, Inc., the U.S. chemicals unit of Elf Aquitaine S.A.  Atofina was the U.S. chemicals unit of TotalFinaElf S.A. and was a wholly owned TotalFinaElf Holdings USA, Inc. subsidiary, which was a wholly owned Defendant TotalFinaElf S.A. subsidiary.

15.    Atofina Chemicals, Inc. was renamed from Elf Atochem North America, Inc. in mid-2000 after the TotalFina and Elf Aquitaine (Elf Atochem's parent company) merger.  The former Elf Atochem North America, Inc. was established in 1989 through the Atochem, Inc., M&T Chemicals, Inc. and the Pennwalt Corporation merger.  In 1998, Elf Atochem North America, Inc. purchased DuPont's Hydrogen Peroxide plant in Memphis, Tennessee.  During the Class Period, Atofina manufactured, marketed, and sold Hydrogen Peroxide in the U.S., including the Class Jurisdictions, both, directly and through its predecessors, successors, affiliates, subsidiaries, and distributors.

16.    Defendant Arkema Inc. is Atofina Chemicals Inc.'s successor corporation and was formed on October 1, 2004 as a part of the reorganization of Total S.A.'s chemical business.  Arkema is a Pennsylvania corporation with its principal place of business at 2000 Market Street, Philadelphia, Pennsylvania 19103.  During the Class Period, Arkema directly or through its subsidiaries, affiliates, or distributors, manufactured, marketed, sold, and distributed Hydrogen Peroxide in the U.S., including the Class Jurisdictions.

17.    Defendant TotalFinaElf S.A. is a French corporation with its principal place of business in Paris, France.  Atofina operates plants in Europe, North America, and Asia.  Since 1998, Atofina, and subsequently Arkema, has been the third largest Hydrogen Peroxide in the world producer, with a production capacity of 341,000 metric

4

tons and operating plants in Europe, North America, and Asia. During the Class Period, TotalFinaElf S.A. manufactured, marketed, and sold Hydrogen Peroxide in the U.S., including the Class Jurisdictions, through its predecessors, successors, affiliates and subsidiaries, including its wholly owned subsidiary Defendant Atofina Chemicals, Inc.

18.    Defendant Total S.A. is a French corporation with its principal place of business in Paris, France. Total S.A. was formed on May 6, 2003 and is Defendant TotalFinaElf S.A.'s new name. During the Class Period, Total S.A. directly or through its subsidiaries, affiliates, and distributors, manufactured, marketed, sold, and distributed Hydrogen Peroxide in the U.S., including the Class Jurisdictions.

19.    Defendants Atofina Chemicals, Inc., Arkema Inc., TotalFinaElf S.A. and Total S.A. are collectively referred to as the "Atofina Defendants."

**FMC Corporation**

20.    Defendant FMC Corporation is a Delaware corporation with its principal places of business at 1735 Market Street, Philadelphia, Pennsylvania 19103 and 200 East Randolph Drive, Chicago, Illinois 60601. FMC is the largest producer of Hydrogen Peroxide in the U.S. In 1998, FMC had a capacity of 283 million pounds of Hydrogen Peroxide production. In 2001, FMC produced 303 millions of pounds of Hydrogen Peroxide in the U.S. FMC has operated Hydrogen Peroxide plants in Prince Georges, British Columbia, Bayport, Texas, and Spring Hill, West Virginia, as well as Europe and the Far East. During all or part of the Class Period, FMC both directly and its subsidiaries, affiliates, and distributors, manufactured, marketed, sold, and distributed Hydrogen Peroxide in U.S., including the Class Jurisdictions.

**The Solvay Defendants**

21. Defendant Solvay Interox, Inc. is a Delaware corporation with its principal place of business at 3333 Richmond Avenue, Houston, Texas 77098. Solvay Interox is a wholly owned Solvay America, Inc. subsidiary, which is a wholly owned Solvay S.A. subsidiary. Solvay Interox was the third largest producer in the U.S. in 1998, with a North American capacity of 236 million pounds. In 2001, Solvay Interox produced 286 millions of pounds of Hydrogen Peroxide in the U.S. Solvay Interox has annual sales of approximately $137 million from the sale of Hydrogen Peroxide (75%) and sodium perborate (25%). Solvay Interox operates a Hydrogen Peroxide plant in Deer Park, Texas. In late 2004, Solvay Interox, Inc. was combined and reorganized, along with Solvay Minerals and Solvay Fluorides, to become Solvay Chemicals, Inc. During the Class Period, Solvay Interox manufactured, marketed, and sold Hydrogen Peroxide in the U.S., including the Class Jurisdictions, directly and through its predecessors, affiliates, subsidiaries, and distributors.

22. Defendant Solvay America, Inc. is a Delaware corporation with its principal place of business at 3333 Richmond Avenue, Houston, Texas 77098. Solvay America is a wholly owned Solvay S.A. subsidiary. During the Class Period, Solvay America manufactured, marketed, and sold Hydrogen Peroxide in the U.S., including the Class Jurisdictions, directly and through its predecessors, affiliates, subsidiaries, and distributors, including its wholly owned subsidiary, Defendant Solvay Interox.

23. Defendant Solvay Chemicals, Inc. was formed in late 2004 from the Solvay Interox, Solvay Minerals, and Solvay Flourides' combination, and it is a wholly owned Solvay, S.A. subsidiary. Solvay Chemicals is a Delaware corporation and

maintains its principal place of business at 3333 Richmond Avenue, Houston, Texas 77098. During the Class Period, Solvay Chemicals manufactured, marketed, and sold Hydrogen Peroxide in the U.S., including the Class Jurisdictions, directly and through its predecessors, affiliates, subsidiaries, and distributors.

24.    Defendant Solvay S.A. is a Belgian corporation with its principal place of business in Brussels, Belgium. During the Class Period, Solvay S.A. manufactured, marketed, and sold Hydrogen Peroxide in the U.S., including the Class Jurisdictions, through its predecessors, affiliates, subsidiaries, and distributors, including its wholly owned subsidiaries Defendants Solvay America, Solvay Interox, and Solvay Chemicals. The Solvay companies are currently the world's leading producers of Hydrogen Peroxide and its derivatives, with production units worldwide and $258 million in Hydrogen Peroxide annual sales.

25.    Defendants Solvay Interox, Inc., Solvay America, Inc., Solvay Chemicals, Inc., and Solvay S.A. are collectively referred to herein as the "Solvay Defendants."

**The Degussa Defendants**

26.    Defendant Degussa Corporation is an Alabama corporation with its principal place of business at 379 Interpace Parkway, Parsippany, New Jersey 07054. Degussa is a wholly owned Defendant Degussa A.G. subsidiary. Degussa acquired DuPont's Hydrogen Peroxide business in or about 1998 and became the largest U.S. Hydrogen Peroxide producer. In 1998, Degussa had a 575 million pounds North American capacity. Degussa operates a technical center in Allendale, New Jersey, Hydrogen Peroxide plants in Mobile, Alabama and Winnemucca, Nevada, and has a research and applied technology site in Greensboro, North Carolina. During the Class

Period, Degussa manufactured, marketed, and sold Hydrogen Peroxide in the U.S., including the Class Jurisdictions, directly and through its predecessors, affiliates, subsidiaries, and distributors.

27.    Defendant Degussa A.G. is a German corporation with its principal place of business in Dusseldorf, Germany.  Degussa A.G.'s Hydrogen Peroxide Bleaching & Water Chemicals business unit worldwide has an annual capacity of 430,000 metric tons with Degussa A.G. ranking second worldwide in Hydrogen Peroxide production.  During the Class Period, Degussa A.G. manufactured, marketed and sold Hydrogen Peroxide in the U.S., including the Class Jurisdictions, through control of its predecessors, affiliates subsidiaries, and distributors, including its wholly owned subsidiary Defendant Degussa Corporation.

28.    Defendants Degussa Corporation and Degussa A.G. are collectively referred to herein as the "Degussa Defendants."

**The EKA Chemical Defendants**

29.    Defendant EKA Chemicals, Inc. is a Delaware corporation with its principal place of business at 1775 West Oak Commons Court, Marietta, Georgia 30062. EKA Chemicals is a wholly owned Akzo Nobel, Inc. subsidiary, which is a wholly owned Akzo Nobel, N.V. subsidiary.  In 1998, EKA Chemicals had a 78 million pounds North American Hydrogen Peroxide production capacity and, together with its affiliates, claims to be one of the world's largest Hydrogen Peroxide manufacturers with a total global capacity of 245,000 tons and production plants in the U.S., Sweden, Norway, and Venezuela.  In 2001, EKA Chemicals produced 140 millions of pounds of Hydrogen Peroxide in the U.S.   EKA Chemicals produces chemicals at several plants

8

internationally, including a plant in South Gate, California and has Hydrogen Peroxide plants in Columbus, Missouri and Moses Lake, Washington.  During the Class Period, EKA Chemicals directly and through the control of its subsidiaries, affiliates, and distributors manufactured, marketed, sold, and distributed Hydrogen Peroxide in the U.S., including the Class Jurisdictions.

30.    Defendant Akzo Nobel, Inc. is a Delaware corporation with its principal place of business at 525 West Van Buren Street, Chicago, Illinois 60607.  Akzo Nobel, Inc. is a wholly owned Akzo Nobel Chemicals International B.V. subsidiary, and is EKA Chemicals, Inc.'s parent.  During the Class Period, Akzo Nobel, Inc. directly and through its subsidiaries, affiliates, and distributors manufactured, marketed, sold, and distributed Hydrogen Peroxide in the U.S., including the Class Jurisdictions.

31.    Defendant Akzo Nobel Chemicals International B.V. is a Netherlands company with its principal place of business at Velperweg 76, P.O. Box 9300, 6800 SB Arnhem, The Netherlands.  During the Class Period, Akzo Nobel Chemicals International B.V. directly and through its subsidiaries, affiliates,, and distributors, manufactured, marketed, sold, and distributed Hydrogen Peroxide in the U.S., including the Class Jurisdictions.

**The Kemira Defendants**

32.    Defendant Kemira Chemicals, Inc. is a Georgia corporation with its principal place of business at 245 Townpark Drive, Suite 200, Kennesaw, Georgia 30144. Kemira Chemicals is a wholly Kemira Oyj subsidiary.  Kemira Chemicals operates facilities in Kennesaw, Georgia, Fortville, Indiana, Marietta, Georgia, Midway, Georgia, and Washougal, Washington and operates a Hydrogen Peroxide plant in Canada.  During

the Class Period, Kemira Chemicals directly and through its subsidiaries, affiliates, and distributors, manufactured, marketed, sold, and distributed Hydrogen Peroxide in the U.S., including the Class Jurisdictions.

33.    Defendant Kemira Oyj is a Finnish company with its principal place of business in Helsinki, Finland.  Kemira is one of the world's major Hydrogen Peroxide producers, with production plants in Finland, The Netherlands, South Korea, Canada, Sweden and Japan.    During the Class Period, Kemira directly and through its predecessors, subsidiaries, affiliates, and distributors manufactured, marketed, sold, and distributed Hydrogen Peroxide in the U.S., including the Class Jurisdictions.

## CO-CONSPIRATORS

34.    Whenever reference is made to any act, deed, or transaction of any corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the corporation's management, direction, control, or business affairs.  Moreover, Defendants acted as each other's agents or joint venturers with respect to their conspiracy, and any Defendant that is a subsidiary of a foreign parent acted as its parent company's agent for its parent's U.S. Hydrogen Purchases.

35.    Various other persons, firms and corporations, not yet named as Defendants, participated as co-conspirators in the violations alleged, and aided, abetted, and performed acts and made statements to further Defendants' conspiracy.

## THE HYDROGEN PEROXIDE INDUSTRY

36.    The Hydrogen Peroxide industry has a number of structural characteristics that facilitate horizontal price-fixing, specifically:

10

A.  Hydrogen Peroxide is sold in various grades, and each grade is available in different concentrations; it is a commodity that is fungible among grades; and it is a homogeneous product that is sold by Defendants and purchased by Plaintiffs and sub-class members based on price.

B.  The U.S. Hydrogen Peroxide industry is highly concentrated, facilitating price coordination among the major manufacturers. Indeed, during the Class Period, Defendants accounted for virtually all U.S. Hydrogen Peroxide production.

C.  Substantial barriers to new entry in the Hydrogen Peroxide industry exist. Indeed, entry or expansion into the industry would require a substantial sunk investment and significant time, such that new entry would be neither timely, likely, nor sufficient to restrain incumbent producers. In addition, the minimum viable scale of a Hydrogen Peroxide production facility necessary to ensure a reasonable rate of return and to deter or counteract potential anticompetitive effects likely precludes new entry. Because economic entry would require that a new producer capture a significant market share from existing producers and the costs of entry would be sunk, entry is inherently risky. Furthermore, overcapacity, as well as announced expansions by existing producers, has deterred new entry during the Class Period.

37.  The Hydrogen Peroxide industry is highly concentrated, and in 2001 Defendants accounted for approximately 99% of U.S. production, which was 1.057 billion pounds.

## **DEFENDANTS' HYDROGEN-PEROXIDE CARTEL**

38.  From January 1, 1994 through the present, Defendants' price-fixing cartel artificially inflated Hydrogen Peroxide prices.

39.  From 1987 to 1994, Hydrogen Peroxide's unit shipment value steadily declined. But in 1995, given the double-digit growth rate in Hydrogen Peroxide's demand during the first half of the 1990s, and due to speculations that the EPA would favor

11

bleaching processes using total chlorine-free rather than elemental chlorine-free bleaching, many U.S. Hydrogen Peroxide producers started expanding their capacity:

- In 1995, DuPont expanded its Memphis, Tennessee Hydrogen Peroxide plant capacity to 150 million pounds per year;

- In 1996, EKA Chemicals expanded its Columbus, Missouri plant by 70 million pounds;

- By the end of 1996, FMC had expanded its Bayport, Texas plant to 240 million pounds; and

- Solvay Interox built a new plant in Deer Park, Texas, creating a 190 million pound-per-year facility that was completed in mid-1997 and came on stream in January 1998. Moreover, in 1995, Solvay Interox expanded its Longview, Washington plant to 143 million pounds per year.

40. Due to these efforts, Defendants successfully raised the unit shipment price every year from 1994 through 1996. The industry experienced momentary price declines in 1997 and 1998, which were caused by a various factors, including a slight demand decline, and the industry's overcapacity created by Defendants' expansions. Defendants attempted to reverse or impede the price declines by taking considerable industry capacity off-line:

- In July 1998, FMC reduced its capacity by 100 millions pounds per year at its Bayport, Texas (25% reduction);

- In September 1998, Solvay Interox closed its older Hydrogen Peroxide plant at Deer Park, Texas (representing an annual capacity of 110 million pounds per year); and

- In 1998, DuPont completely exited the industry by selling its Maitland, Ontario plant to Kemira Chemicals Canada.

41. Despite the Hydrogen Peroxide industry's many changes from 1994 to 2004, and fluctuations in Hydrogen Peroxide's unit shipment value, Hydrogen Peroxide's list price remained steady or increased throughout the Class Period. Year after year,

Defendants' list prices remained constant at $.6786 per pound, and in 1995 and 1996, they rose to $.7357 per pound for a short time.

42.    Defendants set their Hydrogen Peroxide prices through standard price lists and trade publications announcements.  Throughout the Class Period, Defendants followed each other's prices and maintained or increased prices in the same amount.

43.    Defendants held meetings and had other discussions during which they implemented their conspiracy.  They discussed the price, sales volumes, production volumes, and market allocation.

44.    During these meetings, Defendants established price increases and their timing.  Defendants also agreed on sales volumes and production volumes and exchanged sales and volume figures.  Defendants used these meetings to implement procedures to monitor the group to ensure compliance with their conspiracy.

45.    Defendants' senior-most executives, including many with Hydrogen Peroxide pricing authority, met regularly throughout the Class Period to discuss matters of mutual interest at meetings of the Chemical Manufacturers' Association, now known as the American Chemistry Council.  Attendees at these meetings included:

a.    <u>FMC</u>: William Walter, William Harvey, Daniel Summers, Michael Smith, Lynda Myrick, and Joseph Cipia;

b.    <u>Degussa Defendants</u> :  Richard Owens;

c.    <u>Solvay Defendants</u> :   Gary Hall (President) and Whit Sadler (CEO);

d.    <u>Atofina Defendants</u> :   Billy Tulos (Business Manager for Chloalkali and Oxygenated Products);

e.    <u>Akzo Defendants</u> :  Dag Stromquist (President); and

f.    <u>Kemira Defendants</u> :   Risto Ojola (President), Robert Scanlon (Vice President), and Seth Spurlock (President and CEO).

13

46.     These meetings and others attended by high-level officials with Hydrogen Peroxide pricing authority were often followed, sometimes in a matter of days, by uniform, industry-wide price increases by all Defendants in identical amounts at various times throughout the Class Period.  As one example, in October 2002, the American Chemistry Council's "leadership" group met in Houston, Texas.  At or about that time, all Defendants announced a $0.3 per pound Hydrogen Peroxide price increase.

47.     In addition to these meetings, Defendants monitored and mutually enforced their coordinated pricing actions by issuing press releases to pre-announce their pricing intentions broadly and publicly to each other's customers, instead of sending mailings targeted to their own customers.

48.     Examples of Defendants' other coordinated price increases include:

- Purchasing Magazine reported that in 2001 average Hydrogen Peroxide prices rose steadily and remained at 46 cents per pound until December 2001;

- In November 2002, all six U.S. Hydrogen Peroxide sellers in the Class Jurisdictions announced 3 cent per pound price increases to be implemented between November 2002 and January 2003.  FMC announced the increase on November 6; Atofina and Kemira announced its on November 11; and Degussa and Solvay announced theirs on November 18.  In an October 30, 2002 conference call with stock analysts, before the price increase announcements, FMC chairman and CEO William Walter stated, "We are in the process of implementing those price increases. . . .  It is premature to comment about the receptivity out there. We have had support from the other competitors. . . ."; and

- In March and April 2003, the producers announced either energy surcharges or 5 cent per pound Hydrogen Peroxide price increases would be implemented in April and May 2003.

49.     In addition to fixing prices and volumes, Defendants divided and allocated markets.  Parent companies divided their subsidiaries and affiliates to implement the

agreed-upon market allocations. Defendants' American executives implemented these directions with the intended and direct consequence of restricting free and open competition in the U.S. market, including the Class Jurisdictions.

50. During the Class Period, Plaintiffs and the sub-class members indirectly purchased Hydrogen Peroxide for their end use.

51. Plaintiffs and the sub-class members paid more for their indirect Hydrogen Peroxide purchases they than they would have paid had Hydrogen Peroxide prices not been fixed and markets allocated.

52. As a direct and proximate result of Defendants' conspiracy, Plaintiffs and the sub-class members have been injured and financially damaged in their respective businesses and property, in amounts presently undetermined amounts.

## CRIMINAL INVESTIGATIONS

53. On March 25, 2003, E.U. inspectors, assisted by officials in four countries, carried out simultaneous and unannounced raids at the premises of the major European Hydrogen Peroxide producers, Solvay, Degussa, BASF, Celanese, and TotalFinaElf. Solvay and BASF acknowledged the investigations in press reports.

54. On April 14, 2003, the E.C. confirmed it had conducted surprise inspections of Degussa A.G., Solvay S.A., and TotalFinaElf S.A. as a part of worldwide Hydrogen Peroxide price-fixing investigation. Commission officials said the chemical sector has traditionally been prone to price-fixing because it is highly concentrated, and the market had been tough for several years.

55. On January 31, 2005, E.C. antitrust regulators confirmed that the E.C. had formally charged 18 chemical companies, including Total S.A. (Arkema), Kemira

Chemical OJY, Solvay S.A., Degussa A.G., Akzo Nobel N.V., and BASF A.G., with fixing prices Hydrogen Peroxide and downstream products including sodium perborate and sodium percarbonate from 1994 to 2001.

56.    E.C. spokesman Jonathan Todd said the E.C. was particularly looking into agreements on prices, exchange of information on prices and sales volumes, agreements on the reduction of production capacity, and the monitoring and implementation of the arrangements among the cartel members.  The formal charges followed the almost two-year investigation into the alleged cartel activities.

57.    Degussa may escape European fines since it disclosed the cartel to the E.C.

58.    The E.C. declined to identify the 12 chemical companies' names against which it filed criminal charges.

59.    Within days of the E.C.'s announcement, several companies, including Arkema/Atofina, Kemira, Solvay, and Akzo Nobel confirmed receiving Statements of Objections.  FMC, though, waited until February 9, 2005, when it confirmed in an SEC Form 8K filing that it had received a Statement of Objections on January 28, 2005 concerning competition-law violations in the European Hydrogen-Peroxide business from 1994 to 2001.  FMC also confirmed that it had received a subpoena for documents from a grand jury sitting in the Northern District of California, which is investigating anticompetitive conduct in the U.S. Hydrogen Peroxide business from 1994 to 2003.

60.    The DOJ is investigating FMC and the other Defendants concerning Hydrogen Peroxide price fixing, and Defendants have acknowledged that a federal grand jury has been convened and is taking evidence concerning this investigation.

## CLASS-ACTION ALLEGATIONS

61.     Plaintiffs bring this action on behalf of themselves and as a class action under the Rule 23 of the Federal Rules of Civil Procedure on behalf of all members of the following sub-classes:

**Sub-Class A**
All persons and business entities in Arizona, California, Minnesota, Nebraska, New York, Tennessee, and Vermont who indirectly purchased Hydrogen Peroxide manufactured by Defendants from January 1, 1994 to present.

Excluded from this Class are public entities; Defendants; entities in which Defendants have a controlling interest; Defendants' employees, officers, directors, or attorneys; Defendants' legal representatives, heirs, successors, or assigns; judicial officers who may hear the case or related persons; jurors; or related people.

**Sub-Class B**
All public entities in California that indirectly purchased Hydrogen Peroxide manufactured by Defendants from January 1, 1994 to present.

62.     The requirements of Rules 23(a), 23(b)(1), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure have been met in that:

A.     **Numerosity.**  Plaintiffs don't know the exact size of the sub-classes, but they can be determined by discovery.  Based on the nature of the commerce involved, Plaintiffs believe the sub-class members are in the millions and hundreds, respectively, and that they are so numerous and geographically dispersed throughout the Class Jurisdictions and California, respectively, that joinder is impracticable.

B.     **Typicality.**  Plaintiffs' claims are typical of all other sub-class members' claims because Plaintiffs' claims arise from Defendants' common course of conduct giving rise to their claims and relief sought, Plaintiffs were injured by Defendants' uniform misrepresentations and omissions, and Plaintiffs paid supra-competitive prices

17

for indirectly purchased Hydrogen Peroxide.  By proving their own claims, Plaintiffs will necessarily prove all sub-class members' claims.

C.    **Commonality.**  Virtually all of the legal and factual issues are common to the sub-class members and include the following, among others:

(i)    Whether Defendants conspired to fix, raise, maintain, or stabilize Hydrogen Peroxide prices;

(ii)   Whether Defendants' conspiracy caused Hydrogen Peroxide prices to be higher than they would've been absent Defendants' conspiracy;

(iii)  The duration of Defendants' conspiracy;

(iv)   The appropriate nature of classwide relief;

(v)    Whether Defendants' conspiracy violated the Class Jurisdictions' statutory or common laws;

(vi)   Whether Plaintiffs and the sub-class members were injured in their businesses or property by Defendants' conspiracy, and the classwide damage measurements;

(vii)  Whether Plaintiffs and the sub-class members are entitled and restitution; and

(viii) Whether damages should be trebled and full consideration provided, according to the Class Jurisdictions' antitrust laws.

D.    **Adequacy of Representation.**    Plaintiffs will fairly and adequately represent and protect the sub-class members' interests and have no interest that conflict with or are antagonistic to the sub-class members.  Plaintiffs have retained experienced and competent class-action counsel.

63.    Class certification is appropriate under Rule 23(b)(3) because a class action is the superior procedural vehicle for Plaintiffs' claims' fair and efficient adjudication:

18

A.    Common questions of law and fact predominate over any individual questions that may arise and litigating these common issues on a classwide basis is enormously economical;

B.    Each sub-class member's individual damage claim is too small to make individual litigation economically viable, and few, if any, sub-class members want to individually control separate actions;

C.    Despite each sub-class member's relatively small claim, these claims' aggregate volume, coupled with the economies of scale inherent in litigating similar claims on a common basis, will enable this case to be litigated on a cost-effective basis, and no unusual difficulties will be encountered in that all questions of law and fact are common to the sub-classes.

64.    Class certification is appropriate under Rule 23(b)(2) because Defendants acted on grounds generally applicable to the sub-class members thereby rendering final injunctive relief or declaratory relief with respect to the sub-classes appropriate.

65.    Class certification is also appropriate under Rule 23(b)(1) because prosecuting separate actions may dispose of absent sub-class members' interests or may substantially impair or impede their ability to protect their interests, and prosecuting separate actions would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants.

## FRAUDULENT CONCEALMENT, EQUITABLE TOLLING, AND CONTINUING VIOLATIONS

66.    Plaintiffs had no knowledge of Defendants' unlawful, self-concealing conspiracy and could not have discovered it earlier by due diligence. Defendants' deceptive practices to avoid detection of, and to fraudulently conceal, their conspiracy, kept it secret until approximately January 5, 2005, when Defendants, for the first time, disclosed that (1) the E.C. had charged them with collusion concerning European Hydrogen Peroxide sales and marketing; and (2) approximately a month later, that a

19

federal grand jury had been empanelled and was conducting a criminal price-fixing investigation concerning their U.S. Hydrogen Peroxide sales and marketing activities.

67. Before this time, Defendants represented publicly, to their customers and others, that their Hydrogen Peroxide pricing activities were unilateral, not collusive, and were based on legitimate factors, like increased costs and other free-market considerations.

68. Every time Defendants refused to disclose their conspiracy, Defendants knew that this undisclosed information was material to people and businesses that purchased directly and indirectly directly from them.

69. Defendants misled Plaintiffs and the members of both sub-classes concerning their pricing, sales, and marketing's true, collusive, and coordinated nature. Defendants also made numerous public pronouncements characterizing the Hydrogen Peroxide market as highly competitive.

70. Defendants actively concealed these facts by affirmatively leading their direct purchasers, Plaintiffs, and the sub-class members to believe that Defendants' conduct and the prices charged were legitimate, and because Defendants kept their conspiracy secret, Plaintiffs weren't aware that Defendants had instead secretly agreed upon Hydrogen Peroxide prices.

71. Defendants' self-concealing activities tolled any applicable statutes of limitations affecting Plaintiffs' claims until January 5, 2005, and Defendants are estopped from relying on any statute of limitations defense before this date because of their deceptive conduct.

**COUNT I**
**(Applicable to Sub-Class A)**
**VIOLATION OF THE CLASS JURISDICTIONS' ANTITRUST LAWS**

72.     Plaintiffs incorporate and re-allege paragraphs 1 - 71.

73.     From at least January 1, 1994 to present, Defendants conspired to fix Hydrogen Peroxide prices and allocate Hydrogen Peroxide customers and markets. Defendants' conspiracy lessened full and free competition in Hydrogen Peroxide's importation and sale into the Class Jurisdictions and controlled its costs, which violated the Class Jurisdictions' antitrust laws, in particular:

Arizona:      Ariz. Rev. Stat. §44-1401 *et seq.*;

California:   Cal. Bus. & Prof. Code §16700, *et seq.*;

Minnesota:    Minn. Code Ann. §325D.49 *et seq.*;

Nebraska:     Neb. Rev. Stat. §59-801 *et seq.*;

New York:     N.Y. Gen. Bus. Law §340 *et seq.*;

Tennessee:    Tenn. Code Ann. §47-25-101 *et seq.*; and

Vermont:      9 Vt. Stat. Ann. §2451 *et seq.*.

74.     Defendants' conspiracy caused them to (a) fix, raise, maintain, and stabilize Hydrogen Peroxide prices; (b) allocate Hydrogen Peroxide's customers and markets; and (c) caused Plaintiffs and the members of Sub-Class A to pay higher prices for indirectly purchased Hydrogen Peroxide.

75.     In formulating and effectuating their conspiracy, Defendants and their co-conspirators:

a.      Met to discuss Hydrogen Peroxide customers and markets;

21

b. Agreed to charge prices at certain levels and to increase or maintain prices for Hydrogen Peroxide sold in the U.S., including in the Class Jurisdictions;

c. Issued price announcements, quotations, and charged prices consistent with their illegal agreement; and

d. Allocated Hydrogen Peroxide markets and customers consistent with their illegal agreement.

76. Defendants' conspiracy had the following effects:

a. Hydrogen Peroxide price competition was restrained, suppressed, and eliminated throughout the U.S., including in the Class Jurisdictions;

b. Hydrogen Peroxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the U.S., including in the Class Jurisdictions; and

c. Hydrogen Peroxide purchasers in the Class Jurisdictions were deprived of free and open market competition and were injured.

77. Defendants' conspiracy substantially affected commerce within the Class Jurisdictions.

78. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the members of Sub-Class A were injured by having paid more for Hydrogen Peroxide than they otherwise would have paid absent Defendants' conspiracy.

**COUNT II**
**(Applicable to Sub-Class A)**
**VIOLATION OF CERTAIN CLASS JURISDICTIONS'**
**CONSUMER-PROTECTION LAWS**

79. Plaintiffs incorporate and re-allege paragraphs 1 - 71.

80. From at least January 1, 1994 to present, Defendants conspired to fix Hydrogen Peroxide prices and allocate Hydrogen Peroxide customers and markets. Defendants' conspiracy lessened full and free competition in Hydrogen Peroxide's

importation and sale into certain Class Jurisdictions and controlled its costs, which violated certain Class Jurisdictions' consumer-protection laws, in particular:

California:    Cal. Bus. & Prof. Code §17200, *et seq.*;

Nebraska:    Neb. Rev. Stat. §59-1601, *et seq.*; and

Vermont:    9 Vt. Stat. Ann. §2451 *et seq.*.

81.    Defendants' conspiracy caused them to (a) fix, raise, maintain, and stabilize Hydrogen Peroxide prices; (b) allocate Hydrogen Peroxide's customers and markets; and (c) caused Plaintiffs and the members of Sub-Class A located in certain Class Jurisdictions to pay higher prices for indirectly purchased Hydrogen Peroxide.

82.    In formulating and effectuating their conspiracy, Defendants and their co-conspirators:

    a.    Met to discuss Hydrogen Peroxide prices, customers, and markets;

    b.    Agreed to charge prices at certain levels and to increase or maintain prices for Hydrogen Peroxide sold in the U.S., including in certain Class Jurisdictions;

    c.    Issued price announcements, quotations, and charged prices consistent with their illegal agreement; and

    d.    Allocated Hydrogen Peroxide markets and customers consistent with their illegal agreement.

83.    Defendants' conspiracy had the following effects:

    a.    Hydrogen Peroxide price competition was restrained, suppressed, and eliminated throughout the U.S., including in certain Class Jurisdictions;

    b.    Hydrogen Peroxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the U.S., including in certain Class Jurisdictions; and

    c.    Hydrogen Peroxide purchasers in certain Class Jurisdictions were deprived of free and open market competition and were injured.

84.    Defendants' conspiracy substantially affected commerce within certain Class Jurisdictions.

85.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the members of Sub-Class A located in certain Class Jurisdictions were injured by having paid more for Hydrogen Peroxide than they otherwise would have paid absent Defendants' unlawful conduct.

## COUNT III
### (Applicable to Sub-Class A)
### UNJUST ENRICHMENT

86.    Plaintiffs incorporate and re-allege paragraphs 1-71.

87.    As the result of Defendants' conspiracy, Plaintiffs and members of Sub-Class A conferred benefits upon Defendants, and Defendants received and retained these benefits under circumstances making it inequitable and unconscionable for Defendants to retain them without paying their reasonable value to Plaintiff and members of Sub-Class A.

88.    As a direct and proximate result of Defendants' unjust enrichment, Plaintiffs and members of Sub-Class A suffered injury and seek an order directing Defendants to return the amount they each improperly paid Defendants, plus interest.

## COUNT IV
### (Applicable to Sub-Class B)
### ANTITRUST LAW VIOLATION

89.    Plaintiff incorporates and re-alleges paragraphs 1 - 71.

90.    From at least January 1, 1994 to present, Defendants conspired to fix Hydrogen Peroxide prices and allocate Hydrogen Peroxide customers and markets. Defendants' conspiracy lessened full and free competition in Hydrogen Peroxide's

importation and sale into California and controlled its costs to California public entities, which violated Cal. Bus. & Prof. Code §16700, *et seq*.

91.    Defendants' conspiracy caused them to (a) fix, raise, maintain, and stabilize Hydrogen Peroxide prices; (b) Hydrogen Peroxide customers and markets; and (c) caused the City of Stockton and the members of Sub-Class B to pay higher prices for indirectly purchased Hydrogen Peroxide.

92.    In formulating and effectuating their conspiracy, Defendants and their co-conspirators:

a.    Met to discuss Hydrogen Peroxide customers, and markets;

b.    Agreed to charge prices at certain levels and to increase or maintain prices for Hydrogen Peroxide sold in the U.S., including to California public entities;

c.    Issued price announcements, quotations, and charged prices consistent with their illegal agreement; and

d.    Allocated Hydrogen Peroxide markets and customers consistent with their illegal agreement.

93.    Defendants' conspiracy had the following effects:

a.    Hydrogen Peroxide price competition was restrained, suppressed, and eliminated throughout the U.S., including to California public entities;

b.    Hydrogen Peroxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the U.S., including to California public entities; and

c.    California public-entity Hydrogen Peroxide purchasers were deprived of free and open market competition and were injured.

94.    Defendants' conspiracy substantially affected California commerce.

95.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the members of Sub-Class B were injured by having paid more for

Hydrogen Peroxide than they otherwise would have paid absent Defendants' unlawful conduct.

**COUNT V**
**(Applicable to Sub-Class B)**
**CONSUMER-PROTECTION LAW VIOLATION**

96.    Plaintiff incorporates and re-alleges paragraphs 1 - 71.

97.    From at least January 1, 1994 to present, Defendants conspired to fix Hydrogen Peroxide prices and allocate Hydrogen Peroxide customers and markets. Defendants' conspiracy lessened full and free competition in Hydrogen Peroxide's importation and sale into California and controlled its costs to California public entities, which violated Cal. Bus. & Prof. Code §17200, *et seq*.

98.    Defendants' conspiracy caused them to (a) fix, raise, maintain, and stabilize Hydrogen Peroxide prices; (b) allocate Hydrogen Peroxide customers and markets; and (c) caused the City of Stockton and the members of Sub-Class B to pay higher prices for indirectly purchased Hydrogen Peroxide.

99.    In formulating and effectuating their conspiracy, Defendants and their co-conspirators:

a.    Met to discuss Hydrogen Peroxide prices, customers, and markets;

b.    Agreed to charge prices at certain levels and to increase or maintain prices for Hydrogen Peroxide sold in the U.S., including to California public entities;

c.    Issued price announcements, quotations, and charged prices consistent with their illegal agreement; and

d.    Allocated Hydrogen Peroxide markets and customers consistent with their illegal agreement.

100.    Defendants' conspiracy had the following effects:

26

a. Hydrogen Peroxide price competition was restrained, suppressed, and eliminated throughout the U.S., including to California public entities;

b. Hydrogen Peroxide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the U.S., including to California public entities; and

c. California public-entity Hydrogen Peroxide purchasers were deprived of free and open market competition and were injured.

101. Defendants' conspiracy substantially affected California commerce.

102. As a direct and proximate result of Defendants' unlawful conduct, the City of Stockton and the members of Sub-Class B were injured by having paid more for Hydrogen Peroxide than they otherwise would have paid absent Defendants' unlawful conduct.

**COUNT VI**
**(Applicable to Sub-Class B)**
**UNJUST ENRICHMENT**

103. Plaintiff incorporates and re-alleges paragraphs 1-71.

104. As the result of Defendants' conspiracy, Plaintiff and members of Sub-Class B conferred benefits upon Defendants, and Defendants received and retained these benefits under circumstances making it inequitable and unconscionable for Defendants to retain them without paying their reasonable value to Plaintiff and members of Sub-Class B.

105. As a direct and proximate result of Defendants' unjust enrichment, Plaintiffs and members of Sub-Class B suffered injury and seek an order directing Defendants to return the amount they each improperly paid Defendants, plus interest.

**PRAYER FOR RELIEF**

Plaintiffs request that this Court enter judgment in their and the sub-class members' favor and against Defendants, as follows:

A.    That this Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure and certify the proposed sub-classes;

B.    With respect to Sub-Class A, that this Court rule that Defendants' conspiracy:

    (1)    Violated the Class Jurisdictions' antitrust statutes and that compensatory damages, including treble damages and full consideration, where applicable, are appropriate, as alleged in Count I;

    (2)    Violated California's, Nebraska's, and Vermont's consumer-protection statutes and that restitution and/or compensatory damages are appropriate, as alleged in Count II; and

    (3)    Unjustly enriched Defendants and that restitution is appropriate, as alleged in Count III.

C.    With respect to Sub-Class B, that this Court rule that Defendants' conspiracy:

    (1)    Violated the California's antitrust statute and that compensatory damages, including treble damages, are appropriate, as alleged in Count IV;

    (2)    Violated California's consumer-protection statute and that restitution and/or compensatory damages are appropriate, as alleged in Count V; and

    (3)    Unjustly enriched Defendants and that restitution is appropriate, as alleged in Count VI.

D.    That this Court permanently enjoin Defendants from conspiring to fix Hydrogen Peroxide prices and allocating Hydrogen Peroxide markets or other injunctive relief as this Court deems appropriate;

E.    That this Court award Plaintiffs post-judgment interest, their costs, and reasonable attorneys' fees; and

28

F.      That this Court order any other relief as it deems just and proper.

## JURY DEMAND

Plaintiffs demand trial by jury on all triable issues.


Dated: October 14, 2005          By:      /s/ Krishna B. Narine____
                                          Krishna B. Narine
                                          LAW OFFICE OF KRISHNA B. NARINE
                                          7839 Montgomery Avenue
                                          Elkins Park, PA 19027
                                          Telephone:     (215) 782-3240
                                          Facsimile:     (215) 782-3241

                                          Francis O. Scarpulla
                                          LAW     OFFICES     OF   FRANCIS    O.
                                          SCARPULLA
                                          44 Montgomery Street, Suite 3400
                                          San Francisco, CA 94104
                                          Telephone:     (415) 788-7210
                                          Facsimile:     (415) 788-0707
                                          **Interim  Co-Lead  Counsel  for  Indirect-
                                          Purchaser Class Plaintiffs
                                          Attorney    for    Colorfast    Dye    and
                                          Printhouse, Inc., Frank Gerenscer, and
                                          Bernard Lawrence Winery**

                                          Gordon Ball
                                          BALL & SCOTT
                                          550 Main Avenue, Suite 601
                                          Knoxville, TN 37902
                                          Telephone:     (865) 525-7028
                                          Facsimile:     (865) 525-4679
                                          **Proposed  Interim  Co-Lead  Counsel  for
                                          Indirect-Purchaser Class Plaintiffs
                                          Attorney for Joelle Prochera, Joe Solo,
                                          Sharon Defren, Terry Muzzey, Laura
                                          Magnuson,    Melinda    Owens,    and
                                          Elizabeth Armstrong**

                                          William H. Parish
                                          Parish & Small
                                          1919 Grand Canal Blvd., Suite A-5
                                          Stockton, CA  95207

Telephone:     (209) 952-1992
Facsimile:     (209) 952-0250
**Proposed Interim Lead Counsel for Public-Entity, Indirect-Purchaser Class Plaintiff**
**Attorney for the City of Stockton**

Mario N. Alioto
TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP
2280 Union Street
San Francisco, CA 94123
Telephone:     (415) 563-7200
Facsimile:     (415) 346-0679

Joseph M. Patane
LAW OFFICE OF JOSEPH M. PATANE
2280 Union Street
San Francisco, CA 94123
Telephone:     (415) 563-7200
Facsimile:     (415) 346-0679

Susan G. Kupfer
GLANCY BINKOW & GOLDBERG LLP
455 Market Street, Suite 1810
San Francisco, CA 94105
Telephone:     (415) 972-8160
Facsimile:     (415) 972-8166

Randy R. Renick
LAW OFFICES OF RANDY R. RENICK
The Marine Building
128 North Fair Oaks Avenue
Pasadena, CA 91103
Telephone:     (626) 585-9608
Facsimile:     (626) 577-7079

Terry Gross
Adam C. Belsky
GROSS & BELSKY LLP
180 Montgomery Street, Suite 2200
San Francisco, CA 94104
Telephone:     (415) 544-0200
Facsimile:     (415) 544-0201

30

Howard Langer
LANGER & GROGAN, P.C.
1600 Market Street, Suite 2020
Philadelphia, PA 19103-7218
Telephone:    (215) 419-6536
Facsimile:    (215) 419-6546
**Attorneys for Colorfast Dye and Printhouse, Inc., Frank Gerenscer, and Bernard Lawrence Winery**

Isaac L. Diel
LAW OFFICE OF ISAAC L. DIEL
135 Oak Street
Bonner Springs, KS 66012
Telephone:    (913) 383-8711
Facsimile:    (913) 422-0307

John G. Felder, Jr.
McGOWAN,    HOOD,    FELDER    &
JOHNSTON
3710 Landmark Drive, Suite 114
Columbia, South Carolina 29204
Telephone:    (803) 779-0100
Facsimile:    (803) 787-0750

Mary G. Kirkpatrick
LISMAN  WEBSTER  KIRKPATRICK  &
LECKERLING, P.C.
84 Pine Street
Burlington, VT  05401
Telephone:    (802) 864-5756
Facsimile:    (802) 864-3629

Daniel R. Karon
GOLDMAN SCARLATO & KARON, P.C.
55 Public Square, Suite 1500
Cleveland, OH 44113-1998
Telephone: (216) 622-1851
Facsimile: (216) 622-1852

Robert G. Pahlke
Dayle Wallien
PAHLKE  SMITH  SNYDER  PETITT  &
EUBANKS
1904 1st Avenue

31

P.O. Box 1204
Scottsbluff, NE 69363
Telephone:     (308) 635-3161
Facsimile:     (308) 632-3128

**Attorneys for Joelle Prochera, Joe Solo, Sharon Defren, Terry Muzzey, Laura Magnuson, Melinda Owens, and Elizabeth Armstrong**