IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

```
                                :
                                :
IN RE: HYDROGEN PEROXIDE        :    CIVIL ACTION NO. 05-666
ANTITRUST LITIGATION            :
                                :
                                :
                                :
This Document Relates To:       :
                                :    MDL DOCKET NO. 1682
DIRECT PURCHASER ACTION         :
                                :
                                :
```

MEMORANDUM

Dalzell, J.                                    January 19, 2007

On January 31, 2005, European Union regulators charged
eighteen hydrogen peroxide manufacturers with price-fixing.  A
little over a year later, two manufacturers pled guilty to
criminal price-fixing charges in the United States.  Many
putative class action filings followed these government
investigations.  The Judicial Panel on Multidistrict Litigation
transferred all of these actions to this Court.  In re Hydrogen
Peroxide Antitrust Litig., 374 F. Supp. 2d 1345 (J.P.M.L. 2005).
We have since consolidated and divided those cases into three
actions:  one for direct purchaser plaintiffs, one for indirect
purchaser plaintiffs, and an opt-out action that Conopco, Inc.
and Reckitt Bensicker, Inc. filed.

In the direct purchaser action, plaintiffs ask us to
certify a class under Fed. R. Civ. P. 23(b)(3), defined as:

> All persons or entities, including state,
> local and municipal government entities but
> excluding federal government entities
> (excluding defendants, and their parents,
> predecessors, successors, subsidiaries and
> affiliates) who purchased hydrogen peroxide,
> sodium perborate and sodium percarbonate

> (collectively "Hydrogen Peroxide") in the
> United States, its territories and
> possessions, or from a facility located in
> the United States, its territories and
> possessions, directly from any of the
> defendants, or any of their parents,
> predecessors, successors, subsidiaries and
> affiliates, at any time during the period
> from January 1, 1994 to January 5, 2005 (the
> "Class Period").[1]

Now that we have completed[2] an inordinately protracted briefing cycle, plaintiffs' motion is ripe for decision.  Because we find that plaintiffs have met the requirements for class certification, we will grant their motion and certify a class whose definition is similar to plaintiffs' request.

## I.  Standard for Class Certification[3]

The class action device is appropriate in cases where it "saves the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion under Rule 23." <u>Gen. Tel. Co. of the Sw. v. Falcon</u>, 457 U.S. 147, 155 (1982) (<u>quoting</u>

---

[1] The consolidated amended class action complaint defined two separate classes:  a private class and a government class.  Because plaintiffs have identified no legally significant difference between these groups or their theories of recovery, they have elected to seek certification of a single class encompassing both groups.

[2] We are aware that defendants have moved for a further opportunity to respond.  After our Order of November 6, 2006 in which we said "[w]hile we do not forbid the parties from seeking leave to file further reply briefing, such requests will be viewed with even more than the usual measure of skepticism," it should come as no surprise to defendants that we will deny their motion without further comment.

[3] We will dispense with a formal recitation of the facts and procedural history.  They are addressed at length in <u>In re Hydrogen Peroxide Antitrust Litig.</u>, 401 F. Supp. 2d 451 (E.D. Pa. 2005).

Califano v. Yamasaki, 442 U.S. 682, 701 (1979)).  A party seeking
to certify an action for class litigation must first meet the
four requirements of Fed. R. Civ. P. 23(a):

> (1) the class is so numerous that joinder of
> all members is impracticable, (2) there are
> questions of law or fact common to the class,
> (3) the claims or defenses of the
> representative parties are typical of the
> claims or defenses of the class, and (4) the
> representative parties will fairly and
> adequately protect the interests of the
> class.

These requirements are generally referred to as numerosity,
commonality, typicality, and adequacy.

A party who satisfies the Rule 23(a) prerequisites must
then meet the requirements of one of the subsections of Rule
23(b).  Here, plaintiffs seek certification under Rule 23(b)(3),
which allows certification where

> the court finds that the questions of law or
> fact common to the members of the class
> predominate over any questions affecting only
> individual members, and that a class action
> is superior to other available methods for
> the fair and efficient adjudication of the
> controversy.

It should come as no surprise that courts, both in this
Circuit and elsewhere, have regularly certified as class actions
suits alleging a horizontal price-fixing conspiracy.  See Pl.
Mem., exhs. A-C (citing cases).  Because litigation in price-
fixing cases will usually focus on the existence, scope, and
effect of the alleged conspiracy, the goals of judicial economy
and fairness in such cases will very often be well served by Rule
23's tools.  This does not, of course, relieve us of the duty to
engage in "rigorous analysis" before certifying the class.

<u>Falcon</u>, 457 U.S. at 161.  The suitability of this type of action
for litigation under Rule 23, however, is an ever-present factor
in that analysis.  As Judge Bechtle put it in <u>Cumberland Farms,
Inc. v. Browning-Ferris Indus.</u>, 120 F.R.D. 642, 645 (E.D. Pa.
1988) (citations omitted), "[i]t is well recognized that private
enforcement of [antitrust] laws is a necessary supplement to
government action.  With that in mind, in an alleged horizontal
price-fixing conspiracy case when a court is in doubt as to
whether or not to certify a class action, the court should err in
favor of allowing the class."

## II.  The Rule 23(a) Factors

Although the defendants do not specifically contest
plaintiffs' assessment that this proposed class action meets the
requirements of Rule 23(a), in order to do our <u>Falcon</u> "rigorous
analysis," we will address each of them briefly.

### A.  <u>Numerosity</u>

"No definite standard exists concerning a magic number
satisfying the numerosity requirement, nor must plaintiff allege
the exact number or identity of class members." <u>Cumberland
Farms</u>, 120 F.R.D. at 645.  Plaintiffs have alleged, on good faith
belief, "that there are hundreds, if not thousands, of members of
the Class[]."  Compl. ¶ 60.[4]  Courts are permitted to "accept
common sense assumptions" about the numerosity requirement.  <u>In
re Linerboard Antitrust Litig.</u>, 203 F.R.D. 197, 205 (E.D. Pa.

---

[4] References to the complaint are to the Consolidated
Amended Class Action Complaint filed April 29, 2005.

2001) (quoting <u>In re Cephalon Sec. Litig.</u>, 1998 WL 470160 at *2 (E.D. Pa. Aug. 12 1998)). We find that there are enough class members that individual joinder of them would be impracticable. The requirement of Rule 23(a)(1) is, therefore, satisfied.

### B. <u>Commonality</u>

"The commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." <u>Baby Neal v. Casey</u>, 43 F.3d 48, 56 (3d Cir. 1994). This low bar recognizes that, even where factual differences may exist between putative class members, the class action may be a useful method of resolving those issues that are common to them all. "Antitrust, price-fixing conspiracy cases, by their nature, deal with common legal and factual questions about the existence, scope and effect of the alleged conspiracy." <u>In re Sugar Indus. Antitrust Litig.</u>, 73 F.R.D. 322, 335 (E.D. Pa. 1976).

The case includes many common questions of law and fact, with seven coming readily to mind:

(a) Whether defendants and others engaged in a combination and conspiracy to fix, raise, maintain, or stabilize prices; allocate customers and markets; or control and restrict output of hydrogen peroxide, sodium perborate, and sodium percarbonate sold in the United States;

(b) The identity of the participants in the alleged conspiracy;

(c)   The duration of the alleged conspiracy and the nature and character of the defendants' acts performed in furtherance of it;

(d)   The effect of the alleged conspiracy on the prices of hydrogen peroxide, sodium perborate, and sodium percarbonate during the class period;

(e)   Whether the alleged conspiracy violated the Sherman Act;

(f)   Whether the activities alleged in furtherance of the conspiracy or their effect on the prices of hydrogen peroxide, sodium perborate, and sodium percarbonate during the class period injured named plaintiffs and the other members of the class;

(g)   The proper means of calculating and distributing damages.[5]

By identifying such common issues of law and fact, plaintiffs have satisfied the commonality requirement of Rule 23(a).

---

[5] It is possible that the actual distribution of damages is also a common question.  It is more likely, however, that any suitable mechanism for determining damages will include significant questions that are unique to each plaintiff.  As we discuss below, this does not preclude the certification of a class to address the common issues.  Because it is impossible to know at this stage whether the actual quantum of damage suffered by any plaintiff will be provable by common means, we will not certify the class as to that issue.  Of course if, at a future date, it becomes clear that damages are provable on a class-wide basis, we may modify our class certification order under Rule 23(c)(1)(C).

C. <u>Typicality</u>

"The typicality requirement is designed to align the interests of the class and the class representatives so that the latter will work to benefit the entire class through the pursuit of their own goals." <u>Barnes v. Am. Tobacco Co.</u>, 161 F.3d 127, 141 (3d Cir. 1998). In determining whether the named plaintiffs' claims are typical, we look at whether "the named plaintiff[s'] individual circumstances are markedly different or . . . the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based." <u>Eisenberg v. Gagnon</u>, 766 F.2d 770, 786 (3d Cir. 1985) (quoting <u>Weiss v. York Hosp.</u>, 745 F.2d 786, 809 n.36 (3d Cir. 1984)). Because typicality is concerned primarily with the prevention of conflicts of interest between the named plaintiffs and the other class members, "even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories." <u>Baby Neal</u>, 43 F.3d at 58. In a case like this one where "it is alleged that the defendants engaged in a common scheme relative to all members of the class, there is a strong assumption that the claims of the representative parties will be typical of the absent class members." <u>Linerboard</u>, 203 F.R.D. at 207 (quoting <u>In re Catfish Antitrust Litig.</u>, 826 F. Supp. 1019, 1035 (N.D. Miss. 1993)).

Here, each class member will pursue an identical legal theory, namely that the defendants conspired to fix prices and, as a result, that the class members were overcharged. We do not

foresee a conflict between the named plaintiffs and the other members of the class.  Further, the group of named plaintiffs proposed is sufficiently diverse that each member of the class can expect to have its interests well represented.

D.  Adequacy

"Adequacy of representation assures that the named plaintiffs' claims are not antagonistic to the class and that the attorneys for the class representatives are experienced and qualified to prosecute the claims on behalf of the entire class." Baby Neal, 43 F.3d at 55.  "The adequacy of the class representative is dependant on satisfying two factors:  1) that the plaintiffs' attorney is competent to conduct a class action; and 2) that the class representatives do not have interests antagonistic to the interests of the class."  Linerboard, 203 F.R.D. at 207.  Defendants raise no objections on either factor here, which does not surprise us given plaintiffs' counsels' level of professionalism to date.  Because we have no basis upon which to doubt the adequacy of either counsel or the representative plaintiffs, we find that the adequacy requirement is satisfied.

**III.  Necessity of Merits Inquiry**

Though the factors under Rule 23(a) are relatively uncontroversial in this case, the Rule 23(b)(3) factors are hotly contested.  Before we reach them, however, we must address some threshold issues.

The Supreme Court has given to lower courts two instructions that are seemingly difficult to reconcile when considering class certification.  See Linerboard, 203 F.R.D. at 215.  On the one hand, the Court has told us that "nothing in either the language or history of Rule 23 . . . gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177 (1974).  On the other hand, the Court said only four years later that "[e]valuation of many of the questions entering into determination of class action questions is intimately involved with the merits of the claims. . . . The more complex determinations required in Rule 23(b)(3) class actions entail even greater entanglement with the merits." Coopers & Lybrand v. Livesay, 437 U.S. 463, 469 n.12 (1978) (quoting 15 C. Wright, et al. Federal Practice and Procedure § 3911, at 485 n. 45 (1976)).  As the Second Circuit has recently noted in In re Initial Pub. Offering Sec. Litig., 471 F.3d 24, 33 (2d Cir. 2006), in Eisen the Supreme Court was concerned with an inquiry into the merits that went beyond what was required to determine whether Rule 23's requirements were met.  In attempting to reconcile these lines of reasoning, our Court of Appeals has advised us that "[i]n reviewing a motion for class certification, a preliminary inquiry into the merits is sometimes necessary to determine whether the alleged claims can be properly resolved as a class action." Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 168 (3d Cir. 2001).

This is certainly the sort of complex case where some inquiry into the merits will be required at the class certification stage.  We read the jurisprudence, however, as obliging us to limit that inquiry to the minimum necessary at this juncture.  Class certification is concerned primarily with the nature of the proof plaintiffs will offer, not its quantity or sufficiency.  So long as plaintiffs demonstrate their intention to prove a significant portion of their case though factual evidence and legal arguments common to all class members, that will now suffice.  It will not do here to make judgments about whether plaintiffs have adduced enough evidence or whether their evidence is more or less credible than defendants'.  "[A]t the class certification stage, 'the Court need not concern itself with whether Plaintiffs can prove their allegations regarding common impact; the Court need only assure itself that Plaintiffs' attempt to prove their allegations will predominantly involve common issues of fact and law.'"  In re Linerboard Antitrust Litig., 305 F.3d 145, 152 (3d Cir. 2002) (quoting Lumco Indus. v. Jeld-Wen, Inc., 171 F.R.D. 168, 174 (E.D. Pa. 1997)).[6]

With that learning in mind, we examine defendants' motion to exclude the affidavit and testimony of Dr. John C. Beyer, plaintiffs' expert.  Because plaintiffs' analysis of the Rule 23(b)(3) factors depends in large part on the Beyer affidavit, we must first resolve that motion.

---

[6] The Second Circuit's decision in Initial Pub. Offering could be read to impose a higher burden than that in Linerboard or Lumco.  We are, of course, bound to follow the still-binding guidance of our own Court of Appeals on this issue.

The parties agree[7] that Fed. R. Evid. 702 and the gloss the Supreme Court made on it in <u>Daubert v. Merrell Dow Pharm.</u>, 509 U.S. 579 (1993), apply to our determination of whether to accept Dr. Beyer's views in our class action consideration. We will, therefore, structure our resolution of defendants' motion in light of our present procedural need. Because the evidence is here offered for the limited purpose of class certification, our inquiry is perhaps less exacting than it might be for evidence to be presented at trial. "To preclude such evidence at the class certification stage, it must be shown that the "opinion is the kind of 'junk science' that a <u>Daubert</u> inquiry at this preliminary stage ought to screen." <u>Linerboard</u>, 203 F.R.D. at 217 n.13 (quoting <u>In re Visa Check/Mastermoney Antitrust Litig.</u>, 192 F.R.D. 68, 78 (E.D.N.Y. 2000)).

In order to be qualified as an expert, Rule 702 requires that the witness have "specialized knowledge," a requirement that encompasses "practical experience as well as academic training and credentials." <u>Waldorf v. Shuta</u>, 142 F.3d 601, 625 (3d Cir. 1998) (quoting <u>Am. Tech. Res. v. United States</u>, 893 F.3d 651, 656 (3d Cir. 1990). Dr. Beyer's qualifications, both through practical experience and academic training, are extensive and easily satisfy this requirement.[8]

---

[7] Because the parties agree about almost nothing regarding Beyer's testimony, we are glad to be able to highlight at least one undisputed issue.

[8] Blatantly ignoring both the legal standard and the weight of the factual record, defendants open their brief by citing four cases in which courts have criticized Dr. Beyer's findings. In addition to their failure to account for the fact
(continued...)

In addition to qualifications, a potential expert must demonstrate reliability and fit.  Elcock v. Kmart Corp., 233 F.3d 734, 741 (3d Cir. 2000).  Reliability is a question of whether the "opinion is based on valid reasoning and reliable methodology."  Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 806 (3d Cir. 1997).  Defendants' attack on the reliability of Dr. Beyer's methods focuses on his finding of an industry-wide pricing structure.  Beyer Aff. ¶¶ 64-68.  His finding of a pricing structure, however, is not the central theme of his analysis.  Instead, it is meant to confirm the market analysis he provides at paragraphs 27-63.  Though defendants are correct that his initial affidavit did not perform a quantitative analysis of the pricing structure in the hydrogen peroxide industry, in response to defendants' motion, he has supplemented his report with additional quantitative analysis.[9]  Beyer Opp. ¶¶ 17-18.

That defendants' own expert, Prof. Janusz A. Ordover, reaches a different conclusion is of no moment to our resolution of a Daubert motion.  If Daubert required us to choose between the opinions of battling experts, a vital piece of the fact-

---

[8](...continued)
that the issues Dr. Beyer addressed in those cases were largely unrelated to those presented here, defendants also willfully ignore the many more-relevant cases in which Dr. Beyer's testimony has been judicially accepted, and in several instances specifically praised.  See Pl. Mem. Opp. Mot. to Exclude at 1-2 n.2 (citing cases).  Even were the cases defendants cite relevant, they would not persuade us because our decision must be based on his testimony here, not on what other courts have found about different testimony on different facts.

[9] We do not mean to imply that he was required to undertake this quantitative analysis in order to clear the Daubert hurdle.

finding puzzle would be taken from the jury.  We are not permitted, in addressing defendants' Daubert motion, to weigh the relative credibility of the parties' experts.

No more convincing is defendants' contention that, because Dr. Beyer's analysis does not include DuPont,[10] it is somehow invalid.  Because DuPont is not a defendant here, in order to be successful plaintiffs must be able to show market power in the absence of DuPont.  Even while DuPont was operating in the market, defendants still controlled over 70% of the production capacity.  Beyer Opp. ¶ 24.  While Dr. Beyer's decision to exclude DuPont may affect his credibility at a later stage in the litigation, it is certainly no reason to exclude his views on the question before us now.

The question of fit requires us to assess the Rule 702 requirement that "the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003).  Since with regard to class certification we act in the role of the finder of fact, we can easily determine, without concern that the jury will be misled by competing expert reports, that Dr. Beyer's views are useful.  In resolving a Daubert motion at the class certification stage, we must look to whether Dr. Beyer "has identified a generally accepted methodology for determining impact which is applicable to the class, whether this methodology uses evidence

_____

[10] DuPont was, at some times during the proposed class period, the largest single producer of hydrogen peroxide in the United States.  DuPont left the hydrogen peroxide market in 1998 and is not a defendant here.

common to all class members, and whether his opinion has
probative value." Nichols v. SmithKline Beecham Corp., 2003 WL
302352, at *4 (E.D. Pa. Jan. 29, 2003).[11] We find that Dr. Beyer
has clearly done so and that we should consider his statements.

Dr. Beyer's affidavit lends credence to plaintiffs'
allegations by demonstrating that the hydrogen peroxide industry
is susceptible to a price-fixing conspiracy of the sort alleged
here. First and most importantly, hydrogen peroxide, sodium
perborate, and sodium percarbonate are fungible, undifferentiated
commodity products.[12] Beyer Aff. ¶¶ 27-32. This means that
purchasing decisions will be made primarily on the basis of price
rather than quality or specific properties. Id. ¶¶ 30-31. As a

---

[11] Defendants, in an attempt to avoid Nichols, point
out that it was decided before the Court of Appeals' decision in
Wachtel v. Guardian Life Ins. Co. of Am., 453 F.3d 179 (3d Cir.
2006). While Wachtel clarified the requirement that a class
certification decision include "a readily discernable, clear, and
complete list of the claims, issues or defenses to be treated on
a class basis," id. at 17-18, it did not change the quantum of
proof required. Thus, we read Wachtel as placing an additional
requirement on district courts, not on proponents of
certification. We must now identify with more precision than
before the purposes for which a class is certified, but we need
not subject the request for certification itself to greater
scrutiny.

[12] That hydrogen peroxide is sold in multiple grades
and concentrations does not change this fact, contrary to
defendants' claim. Beyer points out that many purchasers use
different concentrations interchangeably depending on
availability. Beyer Aff. ¶ 33. Even among the small percentage
of purchasers who require high purity or specialty grade hydrogen
peroxide, the products will behave as fungible commodities. Id.
¶ 34. In order to succeed at trial in proving impact to
purchasers of specialty grade hydrogen peroxide, plaintiffs need
only show that the price of these grades is related to the price
of standard grade. Defendants essentially admit as much when
they say in their brief "Electronic-grade and propulsion-grade
peroxides are roughly five times more expensive than standard-
grade products." Def. Mem. at 9; see also Ordover Rep. ¶ 33.

result, price is by far the most significant means of competition among producers and an agreement to control prices will seriously hinder competition.

Dr. Beyer's second key observation is that the hydrogen peroxide, sodium perborate, and sodium percarbonate markets are concentrated in a small number of manufacturers.  In 2001, the defendants in this case controlled 99.4% of the hydrogen peroxide production capacity in the United States.  Id. ¶ 44.  In 1998, there were only seven North American manufacturers of hydrogen peroxide.  Id.  This concentration means that, were those few producers to agree to fix prices, no competitor who was not a member of the conspiracy would be able to take up the slack and keep prices stable.

Finally, Dr. Beyer notes that the industry "has high barriers to entry,"  id. ¶ 50, and that there are no close economic substitutes for hydrogen peroxide, id. ¶ 55.  These factors would allow a conspiracy such as the one alleged here to continue indefinitely with limited risk that a new competitor would enter the market and undercut the agreed-upon prices.

Having determined that we should consider Dr. Beyer's affidavit and that its findings will help guide our analysis, we may proceed to address the factors under Rule 23(b)(3).

## IV.  Rule 23(b)(3) Factors

Certification under Rule 23(b)(3) requires the proponent to show both that common questions of law and fact predominate over questions that are unique to individual plaintiffs, and that a class action is superior to other possible

methods of resolving the conflict.  These twin requirements are typically referred to as "predominance" and "superiority."

Plaintiffs' price-fixing claim has three required elements:  (1) that defendants violated the antitrust laws; (2) that defendants' unlawful activity caused antitrust injury to plaintiffs; and (3) the amount of damages sustained as a result. Lumco, 171 F.R.D. at 172.  In assessing plaintiffs' class certification motion with respect to the Rule 23(b)(3) factors, we will concentrate on plaintiffs' ability to prove the first two elements through common or generalized proof.  See Catfish, 826 F. Supp. at 1043 ("The difficulties or challenges which may face the court in the damages phase of this litigation, should it proceed that far, are frail obstacles to certification when measured against the substantial benefits of judicial economy achieved by class treatment of the predominating, common issues."); 6 Alba Conte & Herbert Newberg, Newberg on Class Actions § 18:26 (4th ed. 2002) ("The courts have repeatedly focused on the liability issues, in contrast to damage questions, and, if they found issues were common to the class, have held that Rule 23(b)(3) was satisfied.").

A.  Predominance

"Predominance measures whether the class is sufficiently cohesive to warrant certification." Newton, 259 F.3d at 187 (citing Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623 (1997)).  "[I]t is plaintiffs' burden to establish that common or generalized proof will predominate at trial." Linerboard, 203 F.R.D. at 214.  It is not necessary that

16

plaintiffs' entire case can be made by way of common proof. It suffices if "common issues ... constitute a significant part of the individual cases." <u>Chiang v. Veneman</u>, 385 F.3d 256, 273 (3d Cir. 2004) (internal quotations omitted).

There is no question that common proof will predominate with respect to defendants' alleged violation of the antitrust laws. Defendants contend, however, that plaintiffs cannot show that common proof predominates with respect to antitrust injury or impact.

We begin by noting that, in horizontal price-fixing cases, courts have often been willing to presume impact once a conspiracy is shown. <u>See, e.g.</u>, <u>Linerboard</u>, 203 F.R.D. at 217; <u>Lumco</u>, 171 F.R.D. at 172; <u>In re NASDAQ Market-Makers Antitrust Litig.</u>, 169 F.R.D. 493, 517 (S.D.N.Y. 1996) ("The predominance requirement is satisfied unless it is clear that individual issues will overwhelm the common questions and render the class action valueless."); 6 <u>Newberg on Class Actions</u> § 18.28 (noting that "the allegation of a price-fixing conspiracy is sufficient to establish predominance of common questions" and citing cases). In the Third Circuit, this is sometimes referred to as the <u>Bogosian</u> shortcut. <u>See</u> <u>Bogosian v. Gulf Oil Corp.</u>, 561 F.2d 434 (3d Cir. 1977). <u>Bogosian</u> held that where "a nationwide conspiracy is proven, the result of which was to increase prices to a class of plaintiffs beyond the prices which would obtain in a competitive regime, an individual plaintiff could prove fact of damage simply by proving that the free market prices would be

lower than the prices paid and that he made some purchases at the higher price."  Id. at 455.

Defendants claim that, because hydrogen peroxide prices fell during the class period despite rising costs, plaintiffs cannot use the Bogosian shortcut.  Def. Mem. at 20.  This claim cannot be serious.  Bogosian requires only that prices be higher than "the prices which would obtain in a competitive regime." 561 F.2d at 455.  A conspiracy artificially to support falling prices is no different from a conspiracy to raise prices in an otherwise stable market.  See, e.g., United States v. Container Corp. of Am., 393 U.S. 333, 337 (1969).  The fact that prices declined does not mean that defendants did not artificially inflate them on their way down.

Even were we to find that the Bogosian shortcut did not apply here, Dr. Beyer's analysis of the hydrogen peroxide market, which we discussed in some detail above, would convince us that proof of impact will be common.  "If the industry features homogenous products and markets, a finding that common proof of antitrust impact predominates over individual proof usually is appropriate because the conspiracy claim readily lends itself to common proof of impact."  In re Polypropylene Carpet Antitrust Litig., 178 F.R.D. 603, 620 (N.D. Ga. 1997).

Further, Dr. Beyer has performed a second, confirmatory analysis and concluded that prices in the hydrogen peroxide industry moved similarly over time and the industry exhibited structure in pricing.  Beyer Aff. ¶ 68.  Either the market analysis or the pricing structure analysis would likely be

18

independently sufficient at this stage.  Plaintiffs and Dr. Beyer
have provided us with both.  Despite defendants' claims to the
contrary, we should require no more of plaintiffs in a motion for
class certification.[13]

        Defendants next contend that, because many purchasers
negotiated long-term contracts rather than paying list price,
class-wide impact cannot be proven.  This claim grossly
overstates what courts have required plaintiffs to show at this
stage.[14]  "In a number of price-fixing cases concerning
industries where discounts and individually negotiated prices are
common, courts have certified classes where the plaintiffs have
alleged that the defendants conspired to set an artificially
inflated base price from which negotiations for discounts began."
In re Indus. Diamonds Antitrust Litig., 167 F.R.D. 374, 383
(S.D.N.Y. 1996).  This is sensible given that, even where
individual contracts are negotiated, the list price will likely
and naturally represent a starting point for those negotiations.
"Hence, if a plaintiff proves that the alleged conspiracy
resulted in artificially inflated list prices, a jury could

---

        [13] Defendants' challenge to the substance of Beyer's
pricing structure analysis would, of course, have carried more
weight in the absence of his detailed market analysis.  Because
Beyer presents both, we have no difficulty in finding them
collectively more than adequate.

        [14] Defendants are correct that plaintiffs "must
establish that each class member has, in fact, been injured by
the alleged conduct."  Weisfeld v. Sun Chem. Corp., 210 F.R.D.
136, 144 (D.N.J. 2002).  They do not, however, have to prove it
prior to class certification.  All they need demonstrate now is
that antitrust impact on each member is susceptible to proof by
predominantly common evidence.

reasonably conclude that each purchaser who negotiated an individual price suffered some injury." Id.

This is, of course, the key issue. The determination of whether plaintiffs can prove that inflated list prices caused harm to all purchasers -- even those who did not pay list price -- belongs to the jury. If defendants can show that negotiated prices were unaffected by fluctuations in the list price, a jury may so find. "[E]ven though some plaintiffs negotiated prices, if plaintiffs can establish that the base price from which these negotiations occurred was inflated, this would establish at least the fact of damage, even if the extent of the damage by each plaintiff varied." In re Flat Glass Antitrust Litig., 191 F.R.D. 472, 486 (W.D. Pa. 1999); see also NASDAQ, 169 F.R.D. at 523 ("Neither a variety of prices nor negotiated prices is an impediment to class certification if it appears that plaintiffs may be able to prove at trial that, as here, the price range was affected generally.").

At this stage we are not concerned with whether we find plaintiffs' evidence convincing -- that is a jury question -- but with whether it is predominantly common to all plaintiffs. "Plaintiffs need only make a threshold showing that the element of impact will predominantly involve generalized issues of proof, rather than questions which are particular to each member of the plaintiff class." Lumco, 171 F.R.D. at 174. Surely, the key issue for all plaintiffs in the impact phase of the litigation is whether, in fact, defendants' conspiracy artificially inflated hydrogen peroxide prices. That is a common question. The

complex pricing formula that defendants provide as evidence that
these questions are impossible to resolve in a class setting, see
Def. Mem. at 31-32, includes the market price as an explicit
factor.  Defendants admit that "[u]nder this contract, the price
of hydrogen peroxide was established on the first day of each
calendar quarter based upon market price information."  Id. at 32
(emphasis added).  It is not difficult for plaintiffs to show
that, if the market price is artificially inflated, this formula
will also result in an inflated price.[15]  Although these complex
formulae could potentially make it impracticable to calculate
precise actual damages on a class-wide basis, we have already
found that, if this is true, it will not bar class certification.

Because hydrogen peroxide is a fungible commodity
available from a decidedly limited set of producers, this case is
particularly suitable for treatment under Bogosian.  Even in
spite of the issues defendants raise, we find it reasonable that
plaintiffs would be able to show antitrust impact on all
purchasers merely by showing that defendants kept list prices
that were artificially high because of their conspiracy.[16]

---

[15] Of course, North Pacific Paper Corporation, the
purchaser in this example, may not feel the full impact of an
artificially high list price.  But to show impact, each plaintiff
need only demonstrate a modicum of damage, not that it suffered
as much harm as anyone else.  If this is the best example
defendants have of a price that is unaffected by the market
price, the jury should have no difficulty finding that all
plaintiffs were impacted.

[16] Because the antitrust impact on all purchasers will
be a question for the jury at trial, it is sufficient at this
stage for us to find that it is amenable to class-wide proof.  We
need not find that such impact has already been shown or is more
likely than not.

Defendants next argue that plaintiffs are unable to construct a trial plan that meets the requirements of Wachtel. As we noted above, Wachtel and Rule 23(c)(1)(B) place requirements on courts who issue certification orders, not on the parties seeking certification.[17]  As defendants will see below, we are perfectly able to construct a certification order that meets Wachtel's requirements as we understand them.

Lastly, defendants argue that Dr. Beyer's proposed methods for proving impact and damages are inadequate because he has not completed his analysis.  But defendants cite no case that has actually refused to certify a class on this basis.  A host of courts, by contrast, have determined that it is improper to analyze the correctness or likely success of plaintiffs' proposed analytical model at the class certification stage.  See, e.g. Linerboard, 203 F.R.D. at 220 ("At this point in the litigation, it would be improper to make a determination as to the likely success of using one of the identified methods."); Flat Glass, 191 F.R.D. at 487 ("At this point of the proceedings, it would be improper to make a determination as to the likely success of using a multiple regression analysis.  Rather, we need only concern ourselves with whether plaintiffs have identified a valid method for determining damages, as they have."); In re Domestic Air Transp. Antitrust Litig., 137 F.R.D. 677, 692 (N.D. Ga. 1991)

---

[17] To be sure, Wachtel recommended that courts require the parties to submit pre-certification trial plans.  453 F.3d at 186 n.7.  Had we had the benefit of the Court of Appeals' advice when we ordered briefing in this matter, we might even have done so.  By the time Wachtel was decided, however, plaintiffs had already filed their class certification brief in this case.

("It is not the function of the Court at this time to determine whether Dr. Beyer is correct.  The weight to be given his testimony and its effect is for the fact finder in assessing the merits of plaintiffs' claims at a later date....Plaintiffs have adequately demonstrated their ability to show impact as to each individual by the use of generalized proof.") (citations omitted).

The situation in <u>Flat Glass</u> is instructive.  There, as here, plaintiffs' expert was Dr. Beyer.  He proposed, as he does here, to determine impact and damages using a multiple regression analysis.[18]  Despite the fact that the results of that analysis were not known, the court found that "when used properly multiple regression analysis is one of the mainstream tools in economic study and it is an accepted method of determining damages in antitrust litigation."  <u>Flat Glass</u>, 191 F.R.D. at 486.  That finding was sufficient for the court to find that the predominance requirement was satisfied.[19]

---

[18] Beyer has also found that a benchmark analysis could be used in this case.  He has, therefore, proposed two models where only one is required.

[19] Here, defendants assert without any support at all that "[t]here is no regression formula that any economist could postulate that could take the variables described in the Weyerhaeuser contract into account and also be applied uniformly to an class."  Def. Mem. at 33.  Even if that statement were true (and we are certainly unprepared to take defendants' unsupported claim as gospel), that implies a much greater requirement than the law places on plaintiffs, even at trial.  At trial, plaintiffs will need only show by a preponderance of the evidence that each plaintiff suffered <u>some</u> antitrust harm.  The law does not require plaintiffs to devise a single formula that can mechanistically determine to the very last penny what each plaintiff lost.

At least with regard to violations of the antitrust laws and impact on plaintiffs from such violations, most of plaintiffs' proof will be common rather than specific.  We therefore find that the predominance requirement is satisfied.

B.  Superiority

Rule 23(b)(3)'s superiority requirement "asks us to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication."  Georgine v. Amchem Products, Inc., 83 F.3d 610, 632 (3d Cir. 1996), rev'd on other grounds, Windsor, 521 U.S. 591 (internal quotations omitted).  Among the factors we should examine in making that determination are "(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; [and] (D) the difficulties likely to be encountered in the management of a class action."  Fed. R. Civ. P. 23(b)(3).  Of these, only management difficulties are at issue.[20]

_____

[20] No one has alleged that any party has an interest in the prosecution or defense of separate actions that cannot be satisfied within the context of the proposed class action. Because all pending federal court litigation has already been consolidated here by the Judicial Panel on Multidistrict Litigation, we need not be concerned with elements (B) and (C), either.

In their argument that the proposed class would be
unmanageable, defendants do little more than rehash arguments we
have already rejected above.[21]  We think our earlier discussion
of predominance should make it clear that we disagree with
defendants' contention that certification of this class will
require an inquiry into "each and every negotiated purchase of a
relevant product that Plaintiffs allege was impacted by the
conspiracy."  Def. Mem. at 42.

Rather notably, defendants fail to offer any suggestion
of a method of adjudicating plaintiffs' claims that would be
superior to the proposed class action.  It is well-established
that the most important goals of the class action are "promotion
of efficiency and economy of litigation."  Crown, Cork & Seal Co.
v. Parker, 462 U.S. 345, 349 (1983).  The superiority inquiry
seeks to establish whether there is another method of resolving
the claims that will better serve those goals.  But defendants
have provided no hint or suggestion that there is a better

---

[21] Defendants claim that the complexities of negotiated
prices and use across multiple industries "distinguish this
proposed Class from any ever certified."  Def. Mem. at 42.  While
we disagree, and think this is actually quite similar to many
other price-fixing cases, if the proposed class meets the
requirements of Rule 23, we would certify it even if it were
unique.  See Sugar Indus., 73 F.R.D. at 357 ("Experience under 28
U.S.C. § 1407 and Rule 23 shows that visions of unmanageability
soon disappear, because courts, together with counsel, have been
able to manage litigation of constantly increasing complexity and
magnitude.  Given the sizes of the classes requested, the power
of this Court to modify class definitions, if such proves
necessary, and the ingenuity of this Court and counsel to solve
administrative problems, if and when they arise, this Court is
convinced that the class action technique is the superior method
of adjudicating this litigation.").

method.[22]  We are particularly concerned, as was the court in

Linerboard, that failure to certify the proposed class would

prevent many of the smaller claimants from seeking relief at all

because the costs of litigation would be too great.  See 203

F.R.D. at 223.

We have already established that many, if not all, of

the central issues in this case are amenable to expedient

resolution by means of the class action device.  We find,

therefore, that a class action is the best available way to

adjudicate these claims.

**V.  Scope of the Class**

Defendants raise two objections to the scope of

plaintiffs' proposed class:  the inclusion of purchasers of

hydrogen peroxide, sodium perborate, and sodium percarbonate in a

single class, and the long class period.  Both of these issues

are worthy of further scrutiny.

A.  Persalts Purchasers

Defendants claim that we cannot certify a single class

that includes purchasers of hydrogen peroxide as well as buyers

of sodium perborate and sodium percarbonate (these latter two

chemicals are known as persalts).  Defendants claim that, because

---

[22] While the burden rests with plaintiffs to prove that
adjudication by class action is superior, defendants could
certainly have advanced their argument by providing us with a
practical alternative.  Their desired result seems to be to avoid
litigating these claims at all, an outcome that, while defendants
may wish for it, the Federal Rules of Civil Procedure do not
contemplate under these circumstances.

not all of the defendants sold the persalts,[23] purchasers of those products do not have standing to sue the manufacturers who produced no persalts during the class period. We are aware of no case, and defendants cite to none, that holds that every class action plaintiff must have a cause of action against each defendant. Indeed, it is difficult to imagine how cases such as this one could ever be tried were that the rule. Further, we are confident that, when and if the time comes to devise a means of allocating the damages among both plaintiffs and defendants, we will be able to account for those defendants who did not manufacture all of the products at issue.

While we are dismissive of defendants' standing claim, we do share some of their more general concerns about including all of these purchasers in a single class. It is possible that it will become necessary to separate this class into three subclasses, one for each product.[24] On the record before us, however, we believe it would be premature to do so now. We are, of course, prepared to reconsider this decision as further evidence comes to light and will, if necessary, amend the class under Rule 23(c)(1)(C).

---

[23] According to defendants, the Ako and Eka defendants sold no persalts during the class period and FMC sold no sodium percarbonate.

[24] Plaintiffs have provided sufficient evidence that the conspiracy and impact alleged, if proven, would likely also have affected the prices of persalts that the defendant manufacturers made. Thus, we find no cause at this time to limit the case only to purchasers of hydrogen peroxide itself.

B.  Time Period

Defendants argue that the class period plaintiffs seek -- which runs from January 1, 1994 to January 5, 2005 -- is too broad.  They ask us to shorten the time period to that covered by Solvay and Akzo Nobel's guilty pleas, namely July 1, 1998 to December 1, 2001.  While there can be no doubt that the period covered by the guilty pleas must be included in the class period, defendants provide no justification for their request to limit the time at issue to what defendants have already admitted.  Even in the absence of the guilty pleas, plaintiffs would certainly be entitled to levy allegations of a price-fixing conspiracy.  Thus, the duration of the time the pleas covered does not limit the class we may certify.

Plaintiffs are entitled to define the class period as broadly as their evidence supports.  Plaintiffs' first claim of a price increase resulting from the alleged conspiracy is Arkema's $0.02 per pound increase on September 14, 1994.  Beyer Aff., tbl. 10.  Before then, they have only their unsupported allegation that defendants engaged in a conspiracy "[b]eginning at least as early as January 1, 1994." Compl. ¶ 44.  We will, therefore, shorten plaintiffs' proposed class period only slightly, moving the start date to September 14, 1994.  Plaintiffs' claimed end date is clearly tied to the European Union charges on January 31, 2005, and is, therefore, reasonable.

VI.  **Class Counsel**

As part of the class certification procedure, we are required to appoint class counsel.  Fed. R. Civ. P. 23(g)(1)(A).

Even though there is only a single group of attorneys seeking appointment, we must still determine that they satisfy Rule 23(g)(1), as Fed. R. Civ. P. 23(g)(2)(B) requires.  Under those provisions we must find that class counsel will "fairly and adequately represent the interests of the class."  Fed. R. Civ. P. 23(g)(1)(B).  In making the appointment, we must consider: "[1] the work counsel has done in identifying or investigating potential claims in the action, [2] counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action, [3] counsel's knowledge of the applicable law, and [4] the resources counsel will commit to representing the class."  Fed. R. Civ. P. 23(g)(1)(C).

Upon consideration of all these factors, and having observed their work in this litigation thus far, we have no doubt in the ability of proposed counsel[25] to fairly and adequately represent the class.  We will, therefore, appoint them class counsel.

## VII.  Conclusion

Having determined that plaintiffs' proposed class meets all the requirements of Rule 23(a) and Rule 23(b)(3), we will certify the class much as proposed.  We will, however, shorten the class period slightly as detailed above.  Except for that

---

[25] Those proposed are:  Anthony J. Bolognese, Esq. of Bolognese & Associates, LLC; Michael D. Hausfeld, Esq. of Cohen, Milstein, Hausfeld & Toll, PLLC; Steven A. Kanner, Esq. of Much Shelist Freed Denenberg Ament & Rubenstein, PC; and Robert N. Kaplan, Esq. of Kaplan Fox & Kilsheimer LLP.

change, we modify plaintiffs' proposed order only for clarity and
to conform with the Court of Appeals' directives in <u>Wachtel</u>.



                   BY THE COURT:


                   <u>/s/ Stewart Dalzell, J.   </u>

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| _____ | : | |
| | : | |
| IN RE: HYDROGEN PEROXIDE | : | CIVIL ACTION NO. 05-666 |
| ANTITRUST LITIGATION | : | |
| | : | |
| _____ | : | |
| | : | |
| This Document Relates To: | : | MDL DOCKET NO. 1682 |
| DIRECT PURCHASER ACTION | : | |
| | : | |
| _____ | : | |

<u>ORDER</u>

AND NOW, this 19th day of January, 2007, upon consideration of plaintiffs' motion for class certification (docket entry # 192), defendants' memorandum in opposition (docket entry # 243), defendants' motion to exclude the testimony of Dr. John C. Beyer (docket entry # 250), plaintiffs' memorandum in opposition (docket entry # 259), defendants' request for an opportunity to respond (docket entry # 264), and plaintiffs' response (docket entry # 265) and for the reasons articulated in the accompanying Memorandum of Law, it is hereby ORDERED that:

1.    Plaintiffs' motion for class certification is GRANTED;

2.    Defendants' motion to exclude is DENIED;

3.    Defendants' request for an opportunity to respond is DENIED;

4.    A plaintiff class (the "Class") is hereby CERTIFIED pursuant to Fed. R. Civ. P. 23(b)(3) consisting of:

> All persons or entities, including state, local and municipal government entities (but excluding  defendants, their parents, predecessors, successors, subsidiaries, and affiliates as well as federal government entities) who purchased hydrogen peroxide, sodium perborate, or sodium percarbonate in

the United States, its territories, or possessions, or from a facility located in the United States, its territories, or possessions, directly from any of the defendants, or from any of their parents, predecessors, successors, subsidiaries, or affiliates, at any time during the period from September 14, 1994 to January 5, 2005 (the "Class Period").

5.    The Class is CERTIFIED for resolution of all claims in direct purchaser plaintiffs' consolidated amended class action complaint filed April 29, 2005 and all defenses asserted in defendants' answers thereto;

6.    The Class is CERTIFIED for resolution of the following factual and legal issues:

(a)    Whether defendants and others engaged in a combination and conspiracy to fix, raise, maintain, or stabilize prices; allocate customers and markets; or control and restrict output of hydrogen peroxide, sodium perborate, and sodium percarbonate sold in the United States;

(b)    The identity of the participants in the alleged conspiracy;

(c)    The duration of the alleged conspiracy and the nature and character of the defendants' acts performed in furtherance of it;

(d)    The effect of the alleged conspiracy on the prices of hydrogen peroxide, sodium perborate, and sodium percarbonate during the Class Period;

(e)    Whether the alleged conspiracy violated the Sherman Act;

(f)   Whether the activities alleged in furtherance of the conspiracy or their effect on the prices of hydrogen peroxide, sodium perborate, and sodium percarbonate during the Class Period injured named plaintiffs and the other members of the Class; and

(g)   The proper means of calculating and distributing damages;

7.   Pursuant to Fed. R. Civ. P. 23(g), Anthony J. Bolognese, Esq. of Bolognese & Associates, LLC; Michael D. Hausfeld, Esq. of Cohen, Milstein, Hausfeld & Toll, PLLC; Steven A. Kanner, Esq. of Much Shelist Freed Denenberg Ament & Rubenstein, PC; and Robert N. Kaplan, Esq. of Kaplan Fox & Kilsheimer LLP are APPOINTED class counsel; and

8.   By February 16, 2007, the parties will SUBMIT for the Court's approval a class notice program and forms of notice that are agreeable to counsel for all parties in the direct purchaser action or, if the parties are unable to agree on proper form of notice, proposed notice programs and forms of notice, accompanied by a memorandum not to exceed five pages explaining the parties' competing positions.


BY THE COURT:


_____
Stewart Dalzell, J.