IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

```
_____
                                 :
IN RE: HYDROGEN PEROXIDE         :      CIVIL ACTION NO. 05-666
ANTITRUST LITIGATION             :
_____:
                                 :
THIS DOCUMENT RELATES TO:        :
                                 :
CONOPCO, INC., et al. v.         :
ARKEMA, INC., et al.             :
                                 :      MDL DOCKET NO. 1682
and                              :
                                 :
CONOPCO, INC., et al. v.         :
FMC FORET, S.A.                  :
_____
```

MEMORANDUM

Dalzell, J.                                    March 31, 2010


        Two direct purchasers of hydrogen peroxide and derivative

persalts, Conopco, Inc. and Reckett Benckiser, Inc., here pursue

opt-out claims against FMC Corp. and FMC Foret S.A. (collectively

"FMC")[1] for purported price fixing in alleged violation of

Section 1 of the Sherman Act, 15 U.S.C. § 1.[2] These plaintiffs

_____

        [1] The plaintiffs have resolved their disputes with the
other defendants they named in their Amended Complaint. Pl. Br.
at 7 n.21.

        [2] On October 23, 2006, plaintiffs filed their Amended
Complaint against, inter alia, FMC Corp. ("Amended Complaint" or
"Am. Compl."). Plaintiffs later filed a Complaint against FMC
Foret S.A., which we then consolidated with this action. In the
motion to dismiss, response, and reply, the parties do not
                                            (continued...)

seek to recover damages for purchases of perborates that occurred

in the United States and abroad during the time when the

defendants allegedly engaged in price-fixing. On January 25,

2007, we denied the defendants' previous facial challenge to our

subject matter jurisdiction. After lengthy discovery, FMC again

questions our jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1)

and the Foreign Trade Antitrust Improvements Act of 1982

("FTAIA"),[3] and moves to dismiss the plaintiffs' claims for

perborates purchases made in foreign commerce ("Foreign Purchase

Claims" or "FPC"). But this time FMC makes a <u>factual</u> challenge to

our jurisdiction. For the reasons discussed below, we will grant

FMC's motion to dismiss the FPC.[4]

---

[2] (...continued)
distinguish between the claims in the Amended Complaint against
FMC Corp. and those in the Complaint against FMC Foret S.A., and
our review of these documents confirms that the plaintiffs make
the same substantive claims in each case.

[3] This provision is codified at 15 U.S.C. § 6a.

[4] The defendants argue that we may dismiss the FPC but
allow the plaintiffs to move forward with their domestic claims
--  in other words, that we may split the FPC from the domestic
claims. The plaintiffs argue that these claims are interwoven and
interdependent. But plaintiffs' own expert estimated that the
plaintiffs suffered about $1.1 million in damages for sodium
perborate delivered to them in the United States and $17.7
million for product delivered in Europe. Pl. Br. at 26 n.57.
Because plaintiffs themselves have segregated their domestic
                                                (continued...)

## I.  **Factual Background**

According to the Amended Complaint, hydrogen peroxide is an important ingredient of persalts, which include sodium perborate and sodium percarbonate. Persalts are used for, e.g., bleaching, cleaning, and producing products such as detergents and toothpaste. Persalts are said to be a "commodity product" for which producers "compete primarily on price." Am. Compl. at ¶¶ 42-43. The plaintiffs claim that the defendants dominated the production of persalts during the time of the alleged price-fixing conspiracy.

The defendants move to dismiss plaintiffs' Foreign Purchase Claims for lack of jurisdiction pursuant to Rule 12(b)(1). Such a motion may be a facial or factual attack on the plaintiff's assertion of our jurisdiction. Gould Electronics Inc. v. United States, 220 F.3d 169, 176 (3d Cir. 2000). In reviewing defendants' present factual attack, we may consider evidence outside of the parties' pleadings. Id. Unlike a facial challenge, there is no presumption that the plaintiffs' factual allegations are true.  Turicentro, S.A. v. American Airlines, Inc., 303 F.3d

---

[4] (...continued)
damages from their foreign damages, we readily conclude that we may dismiss the FPC but allow plaintiffs to move forward with their claims for purchases in the United States.

293, 300 n.4 (3d Cir. 2002). The plaintiffs bear the burden of
proving that we in fact have jurisdiction by a preponderance of
the evidence. Doe v. Goldstein's Deli, 82 Fed. Appx. 773, 775 (3d
Cir. 2003); Mortensen v. First Federal Sav. & Loan Ass'n, 549
F.2d 884, 891 (3d Cir. 1977), quoted in Petruska v. Gannon Univ.,
462 F.3d 294, 302 n.3 (3d Cir. 2006).

As FMC asserts a factual attack on our jurisdiction, the
parties have submitted many exhibits with their briefs. We need
not take an extended tour of the disputed facts, however, because
FMC contends that we should grant its motion to dismiss even if
we assume plaintiffs' facts are true. We agree with FMC on this
point. We will therefore briefly discuss the facts that the
plaintiffs present in their response.

The plaintiffs claim that "the domestic and foreign effects
on Plaintiffs of the conspirators'[5] anticompetitive conduct are
interdependent and give rise to Plaintiffs' disputed damages."
Pl. Br. at 1. According to the plaintiffs, they paid "a single
ex-works price established at the same time in global
negotiations with each conspirator for sodium perborate delivered

---

[5] FMC has not conceded that it was a member of the
alleged conspiracy, but we may presume this fact for the purposes
of resolving this motion. Def. Br. at 3.

4

in the U.S. and Europe." <u>Id.</u> at 2. They state that "[t]he

European price was used as the benchmark for the ex-works price

in the parties' global negotiations, and then merely adjusted for

transportation costs and currency differences and the like for

product delivered to the U.S." <u>Id.</u>

FMC argues that the plaintiffs' expert found that there was

a lag between when the harm from the purported antitrust

overcharge occurred in Europe and when it affected the plaintiffs

in the United States, but the plaintiffs contend that any lag

"was simply a function of contract delivery terms and Plaintiffs'

supply needs." <u>Id.</u> at 3. Plaintiffs claim that "anticompetitive

conduct in the U.S. and Europe relating to sodium perborate would

have an effect in <u>both</u> regions <u>at the same time</u>." <u>Id.</u> at 20

(emphasis added).

The plaintiffs claim that FMC acted on United States soil to

further their price-fixing scheme. FMC purportedly met with co-

conspirators in West Virginia where they "agreed to a collusive

supply restriction." <u>Id.</u> at 15. Then FMC and another alleged co-

conspirator allegedly closed hydrogen peroxide facilities in

Texas "to reduce capacity." <u>Id.</u>

In resolving this motion, we will proceed on the assumption

that the defendants were members of a conspiracy that set a

single unified "European" price for perborates that they charged

for sales in the United States and Europe, with small alterations

made for currency differences and delivery costs but not for the

price of the perborates. We also assume that the defendants

overcharged the plaintiffs for their purchases of these chemicals

both domestically and abroad, and that the defendants met in West

Virginia to talk about reducing capacity and then closed hydrogen

peroxide plants in Texas to work toward that goal.

## II.  Analysis

The question before us is whether, given these assumptions,

we have jurisdiction under FTAIA over the Foreign Purchase

Claims. FMC argues that we lack subject matter jurisdiction over

the FPC because the plaintiffs have failed to show that the FPC

meet FTAIA's requirements. According to the defendants' view,

FTAIA mandates that two events occur seriatim for us to have

jurisdiction: (1) there are first domestic effects of the

defendants' antitrust conduct, and (2) those domestic effects

then proximately cause an antitrust claim outside of the United

States. The plaintiffs in essence respond that FTAIA does not

require these two events to occur in order. They contend that we

have jurisdiction over this case where the defendants caused domestic and foreign harm or effects at the <u>same time</u>.

As we extensively discuss below, we agree with the defendants that FTAIA imposes a two-step dance, first with one foot (the domestic effects) and then with the other (the foreign antitrust injury). We hold that under FTAIA the domestic effects must occur first and then proximately cause the foreign antitrust claim. The plaintiffs ask us to conclude that we have jurisdiction over the FPC because they say there is an exception to FTAIA's proximate cause requirement when defendants simultaneously cause foreign and domestic harm. We disagree that the Court has jurisdiction over that single hop with both feet.

### A. <u>FTAIA</u>

FTAIA states in relevant part that Section 1 of the Sherman Act, on which plaintiffs rely, "shall not apply to conduct involving trade or commerce . . . with foreign nations unless (1) such conduct has a direct, substantial, and reasonably foreseeable effect (A) on trade or commerce which is not trade or commerce with foreign nations [<u>i.e.</u>, domestic trade or commerce] . . . <u>and</u> (2) such effect <u>gives rise to</u> a claim under the provisions of sections 1 to 7 of this title, other than this

7

section." 15 U.S.C. § 6a (emphasis added). We will refer to this provision as the "FTAIA exception."

There is no dispute that the FPC here are based on "conduct involving trade or commerce . . . with foreign nations." Whether plaintiffs have alleged a domestic effect that satisfies the first prong of the FTAIA exception ("Domestic Effect Prong") is also not in dispute at this time. But whether the plaintiffs' facts and theory of the case satisfy the second prong -- that the domestic effect "[gave] rise to" the Foreign Purchase Claims ("Causation Prong") -- is hotly contested.

**B.    Empagran I and II and Proximate Cause**

Over twenty years passed before the Supreme Court first construed FTAIA.  Specifically, in 2004 the Court observed that FTAIA "excludes from the Sherman Act's reach much anti-competitive conduct that causes only foreign injury" but that there is an exception to the rule "where (roughly speaking) that conduct significantly harms imports, domestic commerce, or American exporters." F. Hoffman-La Roche Ltd. v. Empagran S.A., 542 U.S. 155, 158 (2004) ("Empagran I"). The Supreme Court held that the FTAIA exception does not apply when a plaintiff's claim "rests solely on the independent foreign harm." Id. at 159. In

8

Empagran I, the Court addressed a situation where the anticompetitive conduct at issue was foreign and there was an adverse domestic effect, so the case clearly came under FTAIA and met the Domestic Effect Prong. But the Supreme Court held that the plaintiffs did not satisfy the Causation Prong if, as the Court assumed, an "_independent_ foreign effect" gave rise to the claim. _Id._ (emphasis added).

The plaintiffs here recognize that the FTAIA exception does not apply if the defendants' anticompetitive conduct causes only foreign injury or solely an independent foreign effect that "gives rise to" a foreign claim. Pl. Br. at 10. But they contend that _Empagran I_ does not resolve the issue before us in the defendants' favor because the domestic and foreign effects of FMC's actions were _inter_dependent and not "independent" from each other. We agree with the plaintiffs that _Empagran I_ does not address the question before us.

In _Empagran I_, the Supreme Court noted, but did not address, the plaintiffs' argument that the FTAIA exception applied because "the anticompetitive conduct's domestic effects were linked to [the] foreign harm." _Empagran I_ at 175. The Supreme Court remanded the case to the Court of Appeals for the District of Columbia ("D.C. Circuit") to consider the plaintiffs' arbitrage

9

contention, namely, that the FTAIA exception applied because "vitamins [the product at issue in Empagran] are fungible and readily transportable" and that "without an adverse domestic effect (i.e., higher prices in the United States), the sellers could not have maintained their international price-fixing arrangement and respondents would not have suffered their foreign injury." Id.

In a decision that has been widely adopted by other courts, the D.C. Circuit concluded on remand that such but-for causation is not sufficient to meet the Causation Prong. Empagran S.A. v. F. Hoffman-LaRoche, Ltd., 417 F.3d 1267, 1270-71 (D.C. Cir. 2005) ("Empagran II"). That court held that the Causation Prong -- specifically the phrase, "gives rise to" -- "indicates a direct causal relationship, that is, proximate causation." Id. at 1271.

Under Empagran II, then, a plaintiff that claims a court has jurisdiction under the FTAIA exception must show that a domestic effect of the defendants' antitrust conduct proximately caused the foreign injury. The D.C. Circuit rejected the plaintiffs' arbitrage-related argument -- "that the vitamin market is a single, global market facilitated by market division agreements so that their injuries arose from the higher prices charged by the global conspiracy (rather than from super-competitive prices

in one particular market)." Id. It concluded that this specie of
interrelation did not satisfy the Causation Prong because it
constituted only but-for causation, not proximate causation.

Our Court of Appeals has not adopted Empagran II, but
District Courts in the Third Circuit, including this one, have
applied it. In re Graphite Electrodes Antitrust Litigation, 2007
WL 137684, *6 (E.D.Pa. Jan. 16, 2007) (Shapiro, J.) (applying
Empagran II and noting that it "is consistent with the comity
considerations enunciated by the Supreme Court in Empagran I --
the only controlling precedent"); In re Intel Corp.
Microprocessor Antitrust Litigation, 452 F.Supp.2d 555, 561
(D.Del. 2006) (applying the proximate cause requirement from
Empagran II). See also Emerson Elec. Co. v. Le Carbone Lorraine,
S.A., 500 F.Supp.2d 437, 445-7 (D.N.J. 2007) (discussing Empagran
II and rejecting plaintiffs' claim that but-for causation
satisfies the Causation Prong).

Other Courts of Appeals have also embraced the proximate
cause requirement from Empagran II. See In re Dynamic Random
Access Memory (DRAM) Antitrust Litigation, 546 F.3d 981, 987 (9th
Cir. 2008) ("DRAM"); In re Monosodium Glutamate Antitrust
Litigation, 477 F.3d 535, 538-9 (8th Cir. 2007). Notably, the
plaintiffs have not cited a single post-Empagran II case -- and

11

our research found none -- that rejects the D.C. Circuit's

holding that the Causation Prong requires proximate causation.

We agree -- with the D.C. Circuit, the Ninth Circuit, the

Eighth Circuit, Judge Shapiro and others who have adopted

Empagran II -- that the Causation Prong imposes a proximate cause

requirement. It is indeed hard to see how we could fairly

interpret the phrase "gives rise to" in any other way.[6]

---

[6] The plaintiffs appear to argue that it is unfair that
FTAIA gives us jurisdiction over cases in which foreign claims
arise after and because of some domestic effect but not when the
defendants' antitrust conduct causes effects domestically and
abroad at the same time. They complain that their "global
procurement programs made them uniquely and/or particularly
vulnerable to the interdependent U.S. and European
anticompetitive effect of the conspirators' conduct." Pl. Br. at
24.

The reach of the FTAIA exception is a policy decision
that our system of government leaves in the first instance to
Congress and, as it involves our relations with foreign
governments, to the Executive Branch.  Indeed, the Supreme Court
in Empagran I recognized that there are serious concerns about
interjecting our antitrust laws -- particularly the imposition of
treble damages -- into foreign transactions. This would run the
risk of not only radically changing the expectation of parties
who enter into foreign transactions but also upsetting the policy
choices of foreign governments regarding regulating commerce in
their own countries. See Empagran I at 164-70; see also id. at
165 ("Why should American law supplant, for example, Canada's or
Great Britain's or Japan's own determination about how best to
protect Canadian or British or Japanese customers from
anticompetitive conduct engaged in significant part by Canadian
or British or Japanese or other foreign companies?").

## C.  <u>Plaintiffs' Arbitrage Theory</u>

The plaintiffs in <u>this</u> case recognize that <u>Empagran II</u> rejected the arbitrage-based theory and have repeatedly argued that they do not seek to invoke our subject matter jurisdiction based on that theory. Pl. Br. at 11 n.23; <u>id.</u> at 28 n.58 (claiming that arbitrage was not a factor in plaintiffs' purchasing decisions because their "global procurement programs . . . involved the setting at one time of a single global price").

But, as the defendants point out, despite these protestations the plaintiffs make some statements that sound <u>exactly</u> like the arbitrage theory the D.C. Circuit rejected in <u>Empagran II</u>. They contend that the low transportation cost of sodium perborate between Europe and the United States, and the relative ease of exporting this product, "explains in part why the conspirators had to collusively restrict supply in both Europe and the United States at the same time, because absent the restraint, a non-compliant European producer could simply ship sodium perborate to the U.S. for sale and disrupt pricing." <u>Id.</u> at 21. <u>See also</u> <u>id.</u> at 27 ("The capacity restraint in Europe depended upon comparable controls in the United States;

otherwise, for example, Solvay could have exported sodium perborate from the U.S. to Europe and disrupted the market."). To the extent that plaintiffs <u>do</u> make an arbitrage-based argument by circumlocution, it is simply a rose by another name that does not satisfy the Causation Prong.

### D.    <u>Plaintiffs' Non-Arbitrage Theories</u>

Setting aside plaintiffs' coded arbitrage contentions, they actually articulate and rely on two theories for satisfying the FTAIA exception: (1) the defendants reduced the production of hydrogen peroxide at plants located in the United States, which "support[ed] collusive price increases" both here and abroad, and held a meeting in West Virginia regarding that plan, Pl. Br. at 15; and (2) the defendants set one global price, which <u>simultaneously</u> affected pricing in the United States and Europe. We will briefly discuss the first theory, but we will mainly focus on the second, which constitutes plaintiffs' main argument.

### 1.    <u>Activities in the United States</u>

The plaintiffs complain that the defendants limit their discussion of the "effect" of the Domestic Effect Prong to increased prices and argue that <u>other</u> conduct, such as restraints

on product supply, could satisfy this prong.[7] Pl. Br. at 9. The plaintiffs claim that certain acts of the conspiracy -- such as the meeting in West Virginia and the closing of two Texas hydrogen peroxide plants -- took place in the United States. Although the plaintiffs do not explicitly articulate the argument, it is possible that closing two hydrogen peroxide plants in Texas, at least,[8] could have "a direct, substantial, and reasonably foreseeable effect . . . on [domestic] trade or commerce," as the Domestic Effect Prong requires.

The plaintiffs contend that the conspirators increased sodium perborate prices domestically and abroad "[i]n connection with the foregoing [supply restricting] conduct," id. at 18, but an amorphous "connection" to something is not proximate cause. They also miss that mark in arguing that "[t]he capacity reductions had their intended effect of establishing market conditions to support collusive price increases." Id. at 15.

---

[7] The plaintiffs also write that "[t]he definition of 'effect' is not limited to a domestic (i.e., U.S.) effect." Pl. Br. at 10. But, as defendants argue in their reply brief, the plain text of FTAIA mandates that the effect for the Domestic Effect Prong be non-foreign, i.e. domestic. We are befuddled by the plaintiffs' claim to the contrary.

[8] Holding a meeting in West Virginia does not meet the Domestic Effect Prong, and plaintiffs also do not show that the West Virginia meeting proximately caused their injuries abroad.

15

Proximate cause requires more than establishing the conditions to make something possible. In fact, as we explained above, courts have repeatedly stated that similar claims based on arbitrage theories do not satisfy the Causation Prong. The plaintiffs must show, furthermore, that the <u>domestic</u> effects proximately caused the injury underlying their <u>Foreign</u> Purchase Claims, but they contend only that the activities here <u>generally</u> "support[ed]" price increases, not that they proximately caused plaintiffs' <u>overseas</u> injuries in particular.[9]

## 2.   <u>Simultaneous Price Increases</u>

Having addressed these arguments, we now focus on plaintiffs' primary claim -- namely, that there is an exception to the proximate cause requirement of the Causation Prong when antitrust conduct causes harm <u>simultaneously</u> in the United States and abroad. As we stated above, proximate causation is a <u>serial</u> process -- <u>i.e.</u>, one thing happens (in this case, a domestic effect) and <u>then</u> another thing happens (in this case, a foreign

_____

[9] The plaintiffs also claim that "the conspirators had as an objective the reduction of both hydrogen peroxide and sodium perborate supply in order to increase prices of both products in the United States and Europe." Pl. Br. at 23. As we discuss below, such simultaneous effects domestically and abroad do not constitute proximate cause.

antitrust claim) <u>because of</u> the first event. The plaintiffs argue

that "the interdependent domestic and foreign effect includes an

inseparable domestic effect which gives rise to Plaintiffs'

challenged claims." Pl. Br. at 12. As the defendants contend, the

events in this case -- as the plaintiffs <u>themselves</u> characterize

them -- would not demonstrate proximate cause because the

plaintiffs claim that the domestic and foreign effects of

defendants' unlawful antitrust conduct happened at the same time.

In tacit recognition of this inconvenient fact, the

plaintiffs argue that there is an "'<u>Empagran</u> exception'" to the

proximate cause rule. <u>Id.</u> at 12. This so-called (unarticulated)

exception allegedly carves out from FTAIA's jurisdictional bar

the defendants' "anticompetitive conduct in the U.S. and Europe

relating to sodium perborate [that] would have an effect in both

regions <u>at the same time</u>." <u>Id.</u> at 20 (emphasis added). In support

of this claim, they primarily rely on three cases, and we will

discuss each of them below in some detail. <u>See</u> <u>id.</u> at 12-13.

Notably, the plaintiffs do not argue that the <u>text</u> of FTAIA

supports their view.

### a.  **Caribbean Broadcasting**

In Empagran II, the D.C. Circuit distinguished Empagran from
a case that it decided seven years earlier, Caribbean
Broadcasting System, Ltd. v. Cable & Wireless PLC, 148 F.3d 1080
(D.C. Cir. 1998). The parties in Caribbean Broadcasting owned
radio stations and other communication-related services in the
Eastern Caribbean. Id. at 1082. In the claims relevant to the
case at hand, the plaintiff alleged that the defendants falsely
advertised that their radio station -- and only their radio
station -- reached the entire Eastern Caribbean. The plaintiff
alleged that the defendants told advertisers in the United States
that they could therefore satisfy their advertising needs in that
region only on the defendants' radio station. This purportedly
violated, inter alia, the anti-monopolization provisions of the
Sherman Act and injured United States advertisers by restricting
their options for purchasing advertising in the Eastern
Caribbean. Id. at 1082, 1086-87. The plaintiff claimed that it
lost advertising revenue because United States advertisers bought
air time on the defendants' station, rather than the plaintiff's.

As an initial matter, Caribbean Broadcasting differs from
this case because it was a facial jurisdictional challenge, and

defendants here assert a factual challenge.[10] But equally important, the key FTAIA question in Caribbean Broadcasting was whether the plaintiffs had alleged facts to support the Domestic Effect Prong, not the Causation Prong. See id. at 1086 ("We now turn to [a defendant's] primary argument, namely, that the complaint fails to allege either harm to U.S. commerce or a relevant market."). See also DRAM, 546 F.3d at 989 n.9 ("it is questionable whether Caribbean Broadcasting has any relevance, because it pre-dates Empagran I and does not interpret the provision of the FTAIA at issue here," which was the Causation Prong). In fact, the word "rise" or the locution "gives rise" -- or cognates thereof -- do not even appear in Caribbean Broadcasting.

In Empagran II, the D.C. Circuit nonetheless stated that "it is clear from the court's opinion" in Caribbean Broadcasting that

---

[10] The defendants also argue that Caribbean Broadcasting has little persuasive value because the D.C. Circuit decided it before the Supreme Court's landmark decisions regarding the motion to dismiss standard in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 129 S.Ct. 1937 (2009). See Caribbean Broadcasting, 148 F.3d at 1086 (applying the standard from Conley v. Gibson, 355 U.S. 41 (1957)). This would be relevant if the defendants were making a facial challenge to the sufficiency of the plaintiffs' allegations. But the defendants now make a factual challenge, so the changes in Twombly and Iqbal do not affect our decision here.

the plaintiffs had satisfied <u>both</u> prongs of the FTAIA exception

test. <u>Empagran II</u>, 417 F.3d at 1270. Given that the court in

<u>Caribbean Broadcasting</u> did not mention the Causation Prong, we

find this observation puzzling. But in <u>Empagran II</u> the D.C.

Circuit reasoned that the plaintiffs met the Causation Prong in

<u>Caribbean Broadcasting</u> because "forcing U.S. businesses to pay

for advertising on the defendant station [the domestic effect] .

. . <u>caused</u> Caribbean to lose revenue because it was unable to

sell advertising to the same U.S. businesses." <u>Id.</u> (emphasis

added). Put this way, the events in <u>Caribbean Broadcasting</u> are a

classic illustration of the serial nature of proximate cause: the

defendants first convinced the advertisers in the United States

to buy advertising on their radio station, and <u>that</u> caused the

plaintiff to lose money.

One could argue that these harms happened simultaneously --

that the plaintiff radio station lost money at the same time that

the United States advertisers gave business to the defendants'

radio station. Indeed, the plaintiffs here believe that <u>Caribbean

Broadcasting</u> "stands for the proposition that an anticompetitive

act occurring in both the U.S. and abroad that has simultaneous

(or interdependent) domestic and foreign effect satisfies the

FTAIA." Pl. Br. at 29. But this is not how the D.C. Circuit,

which decided both Caribbean Broadcasting and Empagran II, characterized the relationship between these events. Neither decision classifies the foreign and domestic effects in Caribbean Broadcasting as interdependent or occurring simultaneously. Indeed, as we explained above, in Empagran II the court described the situation in Caribbean Broadcasting as a two-step, proximate cause process. We conclude, therefore, that if Caribbean Broadcasting -- and the gloss on that case in Empagran II -- has anything to say about the question that we face here, it supports our holding regarding the Causation Prong.

The plaintiffs also quote part of a statement from In re: Intel Corp. Microprocessor Antitrust Litigation, 452 F.Supp.2d 555 (D.Del. 2006) (Farnan, J.), and assert that Intel recognizes that the "'simultaneous, direct foreign and direct domestic effects' [were] found to confer jurisdiction in Caribbean Broad." Pl. Br. at 13 (quoting Intel, 452 F.Supp.2d at 562). But the plaintiffs' quotation from Intel is surgically dismembered and twists Judge Farnan's statement to support their point of view. Judge Farnan wrote in Intel that in Caribbean Broadcasting "the same conduct had simultaneous, direct foreign and direct domestic effects, with the plaintiffs' antitrust claim arising from those

direct domestic effects." <u>Intel</u>, 452 F.Supp.2d at 562 (emphasis added).[11]

When one reads the whole sentence, it is apparent that Judge Farnan's interpretation of <u>Caribbean Broadcasting</u> is consistent with our reading as well as the D.C. Circuit's view of the case in <u>Empagran II</u>. He recognized that although there <u>were</u> simultaneous foreign and domestic effects from the defendant's alleged conduct in <u>Caribbean Broadcasting</u>, the court in that case saw the plaintiff's foreign injuries as a <u>result</u> of the domestic effect.

## b.   <u>Industria Siciliana</u>

The plaintiffs also rely on <u>Industria Siciliana Asfalti, Bitumi, S.p.A. v. Exxon Research and Engineering Co.</u>, No. 75-5828, 1977 WL 1353 (S.D.N.Y. Jan. 18, 1977). This is an unpublished decision from a District Court outside of our Circuit that was written well before FTAIA was even <u>enacted</u>, so we are dubious (to say the least) about the guidance it may offer

---

[11] Judge Farnan also distinguished the situation in that case from <u>Caribbean Broadcasting</u> because the foreign harm for which the plaintiff sought to recover in <u>Intel</u> had <u>no</u> link with the domestic antitrust injury. He dismissed the plaintiff's claims that were "based on foreign conduct and foreign harm" for lack of subject matter jurisdiction under FTAIA. <u>Intel</u>, 452 F.Supp.2d at 563.

regarding whether simultaneous domestic and foreign effects
satisfy the Causation Prong. But the Supreme Court and D.C.
Circuit discussed <u>Industria Siciliana</u> in <u>Empagran I</u> and <u>Empagran
II</u>. <u>Empagran I</u>, 542 U.S. at 171-2; <u>Empagran II</u>, 417 F.3d at 1270.
As we rely heavily on the <u>Empagran</u> duo, we will explore this
historical artifact here.

In <u>Industria Siciliana</u>, the plaintiff was an Italian
corporation that was organized for the purpose of constructing
and operating a petroleum refinery in Italy. <u>Industria Siciliana</u>,
1977 WL 1353 at *1. Simply stated, the plaintiff claimed that the
defendants coerced it into awarding the design and engineering
contract for its refinery to a subsidiary of Exxon (both entities
were United States corporations). The plaintiff otherwise would
have contracted with a different United States firm. <u>Id.</u>
Industria Siciliana alleged that the Exxon entities committed an
antitrust violation when they tied the design and engineering
contract with one Exxon subsidiary to a favorable refining
contract with another. <u>Id.</u> at *2.

The defendants in <u>Industria Siciliana</u> sought dismissal on a
number of grounds, but pertinent to our inquiry here is their
challenge regarding whether the plaintiff had pled a sufficient
"connection with United States commerce to enable it to invoke

the Sherman Act." Id. at *10. The defendants called into question the plaintiff's standing under the Sherman Act and argued that there was "not the requisite impact upon American trade." Id. Judge Haight rejected this argument and held that the defendants' alleged coercion had an impact on domestic commerce because it restrained "trade in the export of design and engineering services." Id. at *11. Judge Haight reasoned that the plaintiff -- a foreign corporation that did not itself directly import or export anything to or from the United States -- had standing to assert its antitrust claims because the "'imposition' which it has suffered [from the coercion] is inextricably bound up with the domestic restraints of trade which have enabled the defendant to enforce the reciprocal transaction upon the plaintiff." Id.

The plaintiffs contend that Empagran I and Empagran II "recognize[] Industria Siciliana as satisfying [the FTAIA exception] because the foreign and domestic effects, in addition to being 'inextricably' linked, were 'dependent' on each other and not independent." Pl. Br. at 30. The D.C. Circuit distinguished Industria Siciliana from Empagran II because the arbitrage theory in Empagran II did not support proximate cause, but the claims in Industria Siciliana did. See Empagran II, 417 F.3d at 1269-71 (identifying Industria Siciliana as a case that

24

the United States cited at oral argument and then stating that proximate cause was established in those cases that the Government cited). The D.C. Circuit thus did <u>not</u> find that <u>Industria Siciliana</u> was an "exception" to the proximate cause requirement; that court only concluded that proximate cause was present in <u>Industria Siciliana</u>.

The Supreme Court also mentioned <u>Industria Siciliana</u> in <u>Empagran I</u>, but in <u>Empagran I</u> the Court assumed that the plaintiffs' foreign injury was independent of the domestic effect. 542 U.S. at 171. The Court distinguished the situation in <u>Empagran I</u> from that in <u>Industria Siciliana</u> because the Italian company's injuries in the latter case were <u>not</u> independent of the domestic effect. <u>Id.</u> at 171-72. The Court therefore concluded that there were <u>factual</u> distinctions between these cases.

The Supreme Court held in <u>Empagran I</u>, moreover, only that FTAIA requires that the domestic effect and foreign injury be related in some way. But the Court implicitly left to the D.C. Circuit the task of defining <u>how</u> they must be related. <u>See id.</u> at 175. As we discussed above, the D.C. Circuit concluded that the relationship must be one of proximate cause. Given all of this, the Supreme Court's citation of <u>Industria Siciliana</u> will not bear the weight that the plaintiffs seek to give it. We do not believe

that the Supreme Court or D.C. Circuit concluded that <u>Industria Siciliana</u> met the FTAIA exception (a meaningless legal proposition in any event).  Instead, these courts simply found that the cases before them were distinguishable from <u>Industria Siciliana</u>.[12]

The plaintiffs contend that "[n]owhere in <u>Caribbean Broad</u>. and <u>Industria Siciliana</u> do those courts require that a domestic and foreign effect occur in a particular order." Pl. Br. at 30. This is technically true, but <u>Caribbean Broadcasting</u> only dealt with the first prong of the FTAIA exception and was decided before the <u>Empagran</u> decisions. And <u>Industria Siciliana</u> was decided before FTAIA even <u>existed</u>. The fact that these two cases do not discuss the serial nature of the proximate cause requirement in the Causation Prong is thus not only unavailing but also unsurprising.

---

[12] Since <u>Industria Siciliana</u> was decided before FTAIA was even enacted, we again doubt that it sheds any light on the issues before us. But even if we were inclined to apply it here, there are two key distinguishing factual differences that would give us pause. The allegations in <u>Industria Siciliana</u> involved coercion and illegal tying, and this case is about price-fixing with no allegations of coercion.

### c.   **MM Global Services**

The plaintiffs claim that <u>MM Global Services, Inc. v. Dow Chemical Co.</u>, 329 F.Supp.2d 337 (D.Conn. 2004), supports their position. In that case, Union Carbide sold products to the plaintiffs who in turn sold them to end-users in India. <u>Id.</u> at 339. Union Carbide then merged with Dow Chemical and eventually informed one of the plaintiffs that it would significantly scale back its sales to that plaintiff. <u>Id.</u> The plaintiffs sued Dow Chemical and Union Carbide for, among other things, price-fixing, in violation of Section 1 of the Sherman Act. <u>Id.</u> at 340. The defendants moved to dismiss the antitrust claim and argued that the complaint failed to meet the Causation Prong. <u>See</u> <u>id.</u> Judge Covello, writing shortly after <u>Empagran I</u>, explained that the plaintiffs must show that "the defendants' conduct affected U.S. commerce and that the effect gave rise to the plaintiff's injury." <u>Id.</u> at 341. The plaintiffs claim that in <u>MM Global</u> "[t]he district court concluded that plaintiffs had satisfied the FTAIA because defendants' price maintenance scheme in India had a simultaneous effect on competition in the U.S." Pl. Br. at 31.

<u>MM Global</u> has little persuasive weight here because it was decided before <u>Empagran II</u> and did not seriously consider the meaning of the statutory phrase "gives rise to," which is the

27

crux of the problem before us. But we also disagree with the
plaintiffs' characterization of the decision in MM Global. The
parties in that case argued about whether the plaintiffs met the
Causation Prong when they claimed that their injuries "both arise
from and give rise to effects on domestic commerce" or that the
effects were "flowing" between domestic and foreign injury. MM
Global, 329 F.Supp.2d at 342 (internal quotations omitted). But
the court concluded that the plaintiffs had sufficiently pleaded
the Causation Prong because the "complaint properly alleges that
the defendants' conduct had an effect on competition in and from
the United States and the plaintiffs were injured as a result of
that effect." Id. (emphasis added). The MM Global plaintiffs
alleged that the defendants fixed prices, which "'proximate[ly]'"
caused "'competition . . . in and from the United States [to be]
improperly diminished and restrained" and that the plaintiffs'
injuries occurred "'as the result of such effect on
competition.'" Id. (quoting from the Complaint in MM Global,
emphasis in the original opinion). The Complaint in that case
apparently alleged not only that the defendants' actions abroad
caused injuries abroad, but also that those injuries had effects
on the domestic market that in turn caused the plaintiffs'
foreign injuries.

28

The court's decision in <u>MM Global</u> thus has little remaining

persuasive force, but even if it did it is in harmony with

<u>Empagran II</u> and its progeny.

### d.   <u>Graphite Electrodes and DRAM</u>

The defendants cite many persuasive cases that support their

position. In the interests of brevity, we discuss here just two

of them, including one from this Court.

In <u>Graphite Electrodes</u>, Judge Shapiro held that the

plaintiffs' claim that "prices were inflated due to [a] worldwide

price-fixing conspiracy" -- a factual scenario quite similar, if

not identical, to the one here -- failed to satisfy the FTAIA

exception requirements. <u>Graphite Electrodes</u>, 2007 WL 137684 at

*4. Judge Shapiro noted that the plaintiff in <u>Graphite Electrodes</u>

did not allege that it made purchases "in the United States

market" or "that prices for graphite electrodes it purchased in

the foreign market were set by prices in the domestic market."

<u>Id.</u> She also rejected the plaintiff's arbitrage-related argument

that price-fixing in the United States sustained price-fixing

abroad and noted that most courts have held that such arguments

do not satisfy the second prong of the FTAIA exception. <u>Id.</u>

Again, the plaintiffs here contend that their claims are not

based on arbitrage concerns, but they fail to make any <u>other</u> argument that domestic effects caused their injuries overseas.

The defendants also rely on the Ninth Circuit's decision in <u>DRAM</u>, where the plaintiff alleged that the defendants "engaged in a global conspiracy to fix DRAM prices, raising the price of DRAM to customers in both the United States and foreign countries." <u>DRAM</u>, 546 F.3d at 984 (stating that the plaintiff made the arbitrage-based argument we discuss above). The Ninth Circuit adopted the proximate cause standard of <u>Empagran II</u> and concluded that the plaintiff failed to show proximate cause because "[i]n particular, [the fact] that the conspiracy had effects in the United States and abroad does not show that the effect in the United States, rather than the overall price-fixing conspiracy itself, proximately caused the effect abroad." <u>Id.</u> at 988, <u>quoted in</u> Def. Br. at 21.

The plaintiff in <u>DRAM</u> contended that in addition to the arbitrage theory it alleged that there was a "direct correlation" between domestic and foreign prices because the prices in the United States set the price worldwide. <u>Id.</u> at 989. This is analogous to the plaintiffs' arguments here regarding the simultaneous effects of the single, ex-works price. We agree with the Ninth Circuit's response to this theory, namely, that "a

direct correlation between prices does not establish a sufficient causal relationship." Id.

In summary, none of the cases on which the plaintiffs rely convinces us to reject the proximate cause requirement of Empagran II or articulate an "Empagran exception." The text of FTAIA, the D.C. Circuit's reasoning in Empagran II, and the opinions of courts following that approach all persuade us that the Causation Prong requires proximate cause. The plaintiffs have not pointed to evidence that the defendants' activities in the United States (e.g., conspiring to close the hydrogen peroxide plants in Texas and meeting in West Virginia) meet the Domestic Effect or Causation Prongs. Their simultaneous harm theory also cannot support a claim that domestic effects of the defendants' conduct proximately caused their foreign claims. We will therefore grant FMC's motion to dismiss the Foreign Purchase Claims.

### E. **When to Resolve this Issue**

The plaintiffs make a half-hearted argument that we should wait until trial to resolve the question of whether we have subject matter jurisdiction under FTAIA. See Pl. Br. at 31-32 (citing CNA v. United States, 535 F.3d 132, 144 (3d Cir. 2008)

31

("where jurisdiction is intertwined with the merits of an FTCA claim . . . a district court must take care not to reach the merits of a case when deciding a Rule 12(b)(1) motion")). But we see no reason to wait. At the defendants' invitation, in resolving this motion we have made _every_ factual assumption in the plaintiffs' favor, even though we are not required to do so in ruling on a factual challenge to our jurisdiction. If we are guilty of anything resembling "reach[ing] the merits" of this dispute, we have done so in the plaintiffs' favor.

Moreover, as the plaintiffs themselves admit, this is a "fully-discovered case." Pl. Br. at 12. We have the facts before us and we have given the plaintiffs the benefit of every doubt. But they have not produced evidence that could even _support_ -- much less _establish_ by a preponderance of the evidence -- a conclusion that the facts here meet the Causation Prong as the jurisprudence defines it. Because the plaintiffs must prove that we have jurisdiction by a preponderance of the evidence, they have fallen well short of the mark. We will deny their request to further delay our decision on this issue.

## III. <u>Conclusion</u>

To satisfy the FTAIA Causation Prong in response to a factual challenge to our subject matter jurisdiction, the plaintiffs must demonstrate by a preponderance of the evidence that domestic effects of the defendants' antitrust conduct proximately caused their foreign injuries.  But plaintiffs have failed to do so. We will thus grant FMC's motion to dismiss the plaintiffs' claims for perborates purchases that they made in foreign commerce.[13]

BY THE COURT:

__\s\Stewart Dalzell

---

[13] The defendants move to dismiss the FPC with prejudice, but a dismissal for lack of jurisdiction is not a decision on the merits. We will therefore dismiss the FPC without prejudice. <u>See</u> <u>Figueroa v. Buccaneer Hotel, Inc.</u>, 188 F.3d 172, 182 (3d Cir. 1999).